*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0047P (6th Cir.)
File Name: 01a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HBRANDON LEE FLAGNER,
  *Plaintiff-Appellee,*

  *v.*

REGINALD WILKINSON, et al.,
  *Defendants-Appellants.*

No. 99-4145

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00887—Susan J. Dlott, District Judge.

Argued: October 16, 2000

Decided and Filed: February 22, 2001

Before: NELSON and MOORE, Circuit Judges;
WILHOIT, District Judge.[*]

---

## COUNSEL

**ARGUED:** Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellants. Michael J. O'Hara,

---

[*] The Honorable Henry R. Wilhoit, Jr., Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Appellee. **ON BRIEF:** Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellants. Michael J. O'Hara, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which WILHOIT, D. J., joined. NELSON, J. (pp. 22-27), delivered a separate opinion concurring in part and dissenting in part.

————————

**OPINION**

————————

KAREN NELSON MOORE, Circuit Judge. The plaintiff, Hbrandon Lee Flagner, filed a 42 U.S.C. § 1983 action alleging that an Ohio prison grooming regulation violated his constitutional right to practice his religion. The defendants ask this court to reverse the district court's order denying the defendants' summary judgment motion based on qualified immunity, arguing that Flagner has not alleged a constitutional violation and that the regulation has a valid penological basis. Based on our precedent in *Pollock v. Marshall*, 845 F.2d 656, 659-60 (6th Cir.), *cert. denied,* 488 U.S. 897 (1988), we **REVERSE** the district court's denial of the defendants' motion for summary judgment based on qualified immunity. We also conclude that Flagner may bring an as-applied challenge to the Ohio prison grooming regulation and that there is a factual dispute on the issue of whether the defendants have a valid penological interest. Accordingly, we **REMAND** to the district court so that Flagner's claims for declaratory and injunctive relief may proceed.

strengthened by the latter part of the *Smith* opinion's penultimate paragraph, where the Court rejected the idea that a religious-practice exception to the general rule was mandated by the First Amendment:

> "But to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." *Smith*, 494 U.S. at 890.

Insofar as my colleagues on the panel have concluded that the courts can and should discern appropriate occasions for waiving Ohio's prison hair regulation on a case-by-case basis, I respectfully dissent.

————————

*Turner*, 482 U.S. at 90. Had such a showing been made, a court could have considered it "as evidence that the regulation does not satisfy the reasonable relationship standard . . . ." *Id.* at 91. But our court has already held, in a Free Exercise Clause context quite similar to the context in which the present appeal arises, that *Turner* cannot justify a remand for factfinding of the sort contemplated by my colleagues on the panel. See *Spies v. Voinovich*, 173 F.3d at 407. Such a remand, as *Spies* declared, "would be the type of 'unnecessary intrusion of the judiciary' into 'problems of prison administration' that *O'Lone* warned against." *Id.*

I can readily understand why my colleagues might wish that the judge who urged a remand in *Spies* had been writing the majority opinion rather than the dissent, just as I can readily understand why they might wish that the views of the Supreme Court justices who urged a remand in *O'Lone* had prevailed. But given the majority holdings in *Spies* and *O'Lone*, and given the post-*Abbott* holding in *Employment Division v. Smith*, I have greater difficulty understanding how it can be thought that we are free to order a remand here.

object is not to prohibit or burden the exercise of religion, and any burden imposed by the state is "merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Smith*, 494 U.S. at 878.

Unlike *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) – a case where, as the *Smith* Court noted (494 U.S. at 884), a prison's refusal to excuse inmates from work to attend worship services was sustained without mention of a "balancing" test – *Smith* did not involve a prison regulation. Oregon's prohibition against the payment of benefits to jobless users of illegal drugs was applicable to the citizenry of the state as a whole. And if the state's blanket prohibition against the payment of benefits to such people was sustainable notwithstanding its incidental effect on the religious practices of adherents of the Native American Church, it would seem to follow *a fortiori*, given the need for judicial restraint in the prison context, that a regulation such as the one at issue here should be sustainable notwithstanding the incidental burden it may place on the religious tenets of some prisoners.

The *Smith* Court was obviously content to follow a categorical approach in determining the constitutionality of the Oregon law. The Court seemed to take it for granted that because the law was constitutional as generally applied, the plaintiffs had no viable free exercise claim.[1] This reading is

---

[1] It is true, as my colleagues on the panel point out in note 5 of the majority opinion, that a Federal Bureau of Prisons regulation banning the delivery to prisoners of periodical publications found "detrimental to institutional security" – a regulation held to be valid on its face – could be found invalid as applied to a particular publication. See *Thornburgh v. Abbott*, 490 U.S. 401 (1989). But I do not read *Thornburgh v. Abbott* as justifying a remand in the case at bar.

Here, as in *Turner v. Safley*, the plaintiffs would have been free, had this been a case of first impression, to attempt to show that the challenged regulation represented an "exaggerated response" to prison concerns, given the alleged existence of "obvious, easy alternatives . . . ." See

---

# I. BACKGROUND

Flagner has been incarcerated with the Ohio Department of Rehabilitation and Correction (ODRC) since 1986. Flagner is a practicing Orthodox Hasidic Jew who brought a § 1983 suit against prison officials challenging the enforcement of Ohio Administrative Code §§ 5120-9-25 (D) and (F),[1] a prison grooming regulation which requires Flagner to cut his beard and sidelocks, also referred to as "peqs," in contravention of the tenets of his religious faith.[2] The

---

[1] Ohio Administrative Code § 5120-9-25(D) provides the following: Haircuts shall be provided as needed. Hair and hairstyles shall be clean, neatly trimmed and shall not extend over te ears or the shirt collar. *Hair and hairstyle shall not protrude more than three inches from the scalp.* Braids and plaits may be worn subject to the limitations of this rule. The following hairstyles or facial hair are not permitted: Initials, symbols, dyes, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness), weaves, wigs, dreadlocks and shaved heads. Other hairstyles not specifically listed herein may be prohibited if they are determined to be either a threat to security or contrary to other legitimate penological concerns. OHIO ADMIN. CODE § 5120-9-25(D) (2000) (emphasis added). Subsection (F) provides, "[s]ideburns, beards, and moustaches must be neatly trimmed. *Facial hair must not protrude more than one-half inch from the skin.*" OHIO ADMIN. CODE § 5120-9-25(F) (2000) (emphasis added).

[2] *The Code of Jewish Law*, Chapter 170, entitled "The Prohibition Against Shaving the Corners of One's Head and Beard" provides the following:

1. [Leviticus 19:27 states: "Do not cut off [the hairs of] the corners of your heads and do not destroy the corners of your beards." Our Sages explain that] there are two "corners of the head," the place at which the skull is attached to the jawbone, near the ear at both the right and left sides of the head. [Shaving the hair off the "corners" is forbidden.]

There are certain opinions that forbid cutting off the hair with scissors if it is done as effectively as if it were done with a razor — *i.e.*, removing all the hair, even that which is closest to the flesh. Therefore, if one is required to remove one's hair for medical reasons, one should be careful not to remove the hair closest to the flesh.

*The area that is forbidden to be shaved extends from the*

defendants are ODRC employees who work at either the Lebanon Correctional Institution (LeCI) or the Madison Correctional Institution (MaCI). Flagner was imprisoned at LeCI from July 8, 1994 to November 20, 1996, and transferred shortly thereafter to MaCI. Prior to his transfer to LeCI, Flagner resided at the Mansfield Correctional Institution. He is currently incarcerated at Ross Correctional Institution.

In 1987, Flagner began studying Judaism and formally converted to Orthodox Judaism in 1991 while incarcerated at the Mansfield Correctional Institution. His religious affiliation has been recognized by the defendants and is not in dispute in this case. Flagner testified during the preliminary injunction evidentiary hearing held on December 3, 1996, that between 1991 when he converted to Judaism and prior to his transfer to LeCI in 1994, Mansfield prison officials did not make any effort forcibly to cut his beard or sidelocks. In fact, a period of five years passed between the time Flagner converted to Orthodox Judaism in 1991 until his first forced cutting in 1996.

On January 26, 1996, Flagner was given a direct order by Defendant Bobby Couch of LeCI, to comply with the grooming regulation, but Flagner refused, stating his religious

---

*hair on one's temples to below the ear, the place from which the lower jaw protrudes.*

　　2. The Torah forbade "destroying" the corners of the beard only with a razor. [Our Sages spoke of] five corners; [their definition, however, is a matter of question] and there are many opinions in this regard. Therefore, a God-fearing person should not pass a razor over his beard at all. [This includes] also his mustache and the hair below the chin.

　　There is no difference between a razor and a sharp stone that cuts hair, *e.g.*, pumice stone. When using a salve to remove one's beard — *e.g.*, a mixture containing lime — one should be careful not to scrape off the substance with a knife, lest one cut off some hair. Instead, one should scrape it off with a sliver of wood or the like.

Joint Appendix ("J.A.") at 140 (Pl.'s Ex. 4, Mem. from Aleph Inst. regarding Jewish Law) (emphasis added).

---

authorities happen to have old photographs and sketches depicting him without such hair; and that Mr. Flagner's beard and sidelocks have never contributed to the clogging of drains in the prison's plumbing system. If all this were shown to be true, if we were writing on a clean slate, and if Mr. Flagner were Ohio's only prison inmate, I might well agree with my colleagues that the regulation should not be allowed to burden Mr. Flagner's right to put into practice his religious beliefs concerning facial hair.

But we are not writing on a clean slate, and Mr. Flagner, unfortunately, is not Ohio's only prison inmate. As of January 2001, according to an Ohio Department of Rehabilitation and Correction "Fact Sheet" available on the internet at www.drc.state.oh.us, Ohio's prison inmate population was 45,540. If three percent of the state's male prison population were to accept the majority opinion's implied invitation to challenge the regulation on grounds comparable to those Mr. Flagner is being allowed to invoke here, the *Turner* factors would have to be separately weighed by the courts in something like 1,000 cases. And that is just in Ohio.

Such an outcome, in my view, would be undesirable. It would also be difficult to reconcile with the proposition – explicitly alluded to in *Turner* – that "judgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials . . . .'" 482 U.S. at 86 (quoting *Pell v. Procunier*, 417 U.S. 817, 827) (1974).

The conclusion that Mr. Flagner's claim is without legal merit finds support, I believe, in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), a decision handed down three years after the decision in *Turner*. The question in *Smith* was whether the State of Oregon could deny unemployment benefits to people who had been fired from their jobs for ingesting a prohibited hallucinogen (peyote) in connection with sacramental activities at a Native American church. The Supreme Court answered in the affirmative, reasoning that where the state's

analysis tailored to the plaintiff's individual circumstances. In a published opinion by which I should have thought this panel bound, our circuit has flatly rejected the idea that prisoners are entitled to this sort of individual fitting:

"By creating the *Turner* test, the Supreme Court surely did not intend to provide a mechanism through which prisoners could mount repeated challenges to prison regulations and require courts to analyze, in detail, the impact such regulations would have in any particular factual setting, even if prior court precedent would seem to dictate the validity of the regulations. On the contrary: the Supreme Court's creation of the *Turner* standard was motivated by a desire to 'ensure[] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoid[] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree.' *O'Lone*, 482 U.S. at 349 (quotation marks omitted). Penal authorities may need a clear rule for dealing with certain continuing or recurring situations, even when that rule could be better-tailored to the rights of individual prisoners through a court's flexible, case-by-case analysis." *Spies v. Voinovich*, 173 F.3d 398, 403 - 04 (6th Cir. 1999).

It may be true, I suppose, that if Mr. Flagner were the only inmate in the Ohio prison system he could show that the hair regulation is not reasonably related to legitimate security interests peculiar to him. It may be true, in other words, that Mr. Flagner himself has never concealed contraband in his beard or sidelocks; that prison officials could easily and safely assure themselves of Mr. Flagner's continuing good behavior by having him run his own fingers through his hair; that no security problems of any kind have ever been associated with Mr. Flagner's facial hair; that his beard and sidelocks have never been mistaken for a "gang identifier;" that he has never attempted to escape from prison; that if he were to escape and shave off his facial hair in an effort to make himself harder to recognize, the effort would be unsuccessful because the

tenets prevented compliance. On February 16, 1996, the Rule Infractions Board found Flagner guilty of disobeying the order and sentenced him to time in a disciplinary isolation unit. On June 21, 1996, Flagner received another direct order from Defendant Couch to comply with the grooming regulation. Flagner then filed a grievance on June 28, 1996, which was reviewed by Defendant David Gardner, Inspector of Institutional Services, on July 11, 1996. In his disposition, Defendant Gardner stated that Flagner was in violation of § 5120-9-25(D) and was required to comply with the regulation. Failure to comply would subject Flagner to "appropriate disciplinary action [] [w]hich may include requiring [Flagner's] hair to be cut or trim[med] against [his] will." Joint Appendix ("J.A.") at 135 (Disposition of Grievance Form). Flagner continued to refuse to comply with the regulation. On July 29, 1996 and in April 1998, the defendants forcibly cut Flagner's beard and sidelocks. Between the time of Flagner's forced cuttings in July 1996 and April 1998, the defendants exempted him and four Native American inmates from the grooming regulation.

Defendant Curtis Wingard, the warden of MaCI testified in his deposition that exempting Flagner from the grooming regulation did not pose additional security problems at MaCI; no additional security precautions were taken with Flagner in excess of the security measures taken with inmates who complied with the grooming regulation. Defendant Wingard also testified that MaCI has neither been required to provide additional security, nor to approve additional overtime to provide security for Flagner and the four Native Americans who were exempted from the grooming regulation. The defendants have only searched Flagner's beard on less than five occasions. These searches have typically involved the defendant running his own fingers through his beard and sidelocks; this process generally took two to three seconds to complete, and contraband has never been recovered from Flagner's beard.

## II. PROCEDURAL HISTORY

On September 6, 1996, Flagner filed a pro se § 1983 action against the Director of ODRC and the warden of LeCI where he was then incarcerated, alleging violations of his religious rights. On January 3, 1997, Flagner filed an amended complaint to include allegations against the warden at MaCI. The magistrate judge held an evidentiary hearing on January 9, 1997 regarding Flagner's motion for a preliminary injunction to prevent the defendants from forcibly cutting his beard and sidelocks. On January 14, 1997, the magistrate judge recommended granting Flagner's motion for preliminary injunction. The district court reversed the magistrate judge's Report and Recommendation and denied Flagner's motion in an order filed on August 8, 1997. The defendants moved for summary judgment on March 27, 1998, and Flagner filed a cross motion for partial summary judgment on June 8, 1998. On February 3, 1999, the magistrate judge entered a Report and Recommendation denying both the defendant's motion for summary judgment and Flagner's cross motion for summary judgment, which the district court adopted in an order dated March 29, 1999.

On May 13, 1999, the defendants filed a second motion for summary judgment based on qualified immunity which is at issue in the present case. On August 24, 1999, the district court entered an order denying the defendant's motion because "[a] reasonable prison official would have known in 1996 that he could not cut Flagner's beard and sidelocks in contravention of his sincerely held religious beliefs in the absence of legitimate penological interests relating to the enforcement of the hair length regulation."[3] J.A. at 236-37 (D. Ct. Order of 8/24/99). The defendants timely filed their Notice of Appeal on September 20, 1999.

---

[3] The district court also incorporated by reference the facts and analysis of the *Turner* factors, contained in the Report and Recommendation filed on February 3, 1999, J.A. at 144-57, and the March 29, 1999 district court Order adopting it. *See* J.A. at 234 (D. Ct. Order of 8/24/99).

229 F.3d 486 (5th Cir. 2000), and *Kimbrough v. California*, No. 00-15075, 2001 U.S. App. LEXIS 1864 (9th Cir. 2001). Within this circuit, Ohio's prison hair regulation has repeatedly been upheld against challenges under the Free Exercise Clause of the First Amendment. See *Williams v. Wilkinson*, No. 96-3715, 1997 U.S. App. LEXIS 36760 (6th Cir. 1997); *Brown v. Wilkerson*, No. 94-4014 (6th Cir. 1995); *Pollock v. Marshall*, 845 F.2d 656 (6th Cir. 1988). See also *Mays v. Wilkinson*, No. 98-3341, 1999 U.S. App. LEXIS 8380 (6th Cir. 1999) (unpublished order) (affirming dismissal for failure to state a claim where Ohio hair regulation was challenged under constitutional provisions other than the Free Exercise Clause).

I do not read *Turner v. Safley*, 482 U.S. 78 (1987), as suggesting that an "as applied" approach can routinely be used to circumvent a well-established body of law such as that upholding the Ohio regulation. Speaking through Justice O'Connor, the *Turner* Court noted that "[r]unning a prison is an inordinately difficult undertaking that requires expertise . . . peculiarly within the province of the legislative and executive branches of government." *Id*. at 84-85. Moreover, the Court continued, "[p]rison administration is . . . a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id*. at 85. Against this background, and after an analysis of the facial validity of challenged Missouri prison regulations under the four "factors" discussed in the majority opinion here, the *Turner* Court upheld the validity of the first of the regulations (a prohibition against correspondence between inmates at different state prisons) on the ground that, as a matter of law, it was "reasonably related to legitimate security interests." *Id*. at 91. The same sort of categorical analysis led the *Turner* Court to invalidate the other challenged regulation, a ban on inmate marriages.

The *Turner* opinion does not imply that an inmate who seeks to challenge a prison regulation the constitutionality of which has already been established is entitled to have the regulation subjected to fresh scrutiny under a four-factor

---

**CONCURRING IN PART, DISSENTING IN PART**

---

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.   I concur in the conclusion that the qualified immunity doctrine bars plaintiff Flagner from attempting to mulct the defendants in damages for requiring him to comply with Ohio's prison regulation regarding facial hair.  But because I believe that the defendants are entitled to prevail at the first stage of the qualified immunity analysis – *i.e.*, because I believe that the application of the regulation to Mr. Flagner is permissible under the Constitution as a matter of law –  I would not let the claims for declaratory and injunctive relief go forward.

The district court's first-stage rationale was as follows:

"[M]aterial issues of fact exist as to the legitimacy of defendants' proffered justifications for enforcing the hair regulation against plaintiff.  * * *  Plaintiff has come forward with evidence from which a trier of fact could reasonably conclude that defendants' enforcement of the grooming regulation against plaintiff was an exaggerated response to or not done for the asserted security concerns."

My colleagues on the panel agree with this rationale.  I respectfully disagree.  I am aware of no basis on which the regulation could properly be held invalid on its face, and it seems to me that the very existence of the regulation justifies its enforcement against Mr. Flagner.

Even under the restrictive statutory standard rejected by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the constitutionality of regulations such as Ohio's was routinely upheld.  See, for example, *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996), and *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996).  Post-*Boerne* decisions, of course, have reached the same result.  See, *e.g., Green v. Polunsky*,

---

## III.  ANALYSIS

### A.  Jurisdiction

This court has jurisdiction over the appeal from the district court's order because denial of summary judgment based on qualified immunity is an immediately appealable collateral order.  *See Mattox v. City of Forest Park*, 183 F.3d 515, 518 (6th Cir. 1999) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985), which categorized the denial of qualified immunity as a collateral order under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)).  In *Johnson v. Jones*, a unanimous Supreme Court held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).

### B.  Denial of Qualified Immunity

The determination of whether qualified immunity applies to an official's actions is a legal determination that we review de novo.  *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).  A motion for summary judgment will be granted if the evidence presented to the court demonstrates that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law.  *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  We must not weigh the evidence, but rather we must only determine whether there is a factual dispute that precludes summary judgment.  *See Liberty Lobby,* 477 U.S. at 249.

In *Harlow v. Fitzgerald,* the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). Qualified immunity protects public officers "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806. In *Butz v. Economou*, the Supreme Court explained that "damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of [qualified] immunity." *Butz v. Economou*, 438 U.S. 478, 508 (1978).

As we explained in *Dickerson*, the first step in determining if the defendants are entitled to qualified immunity is to examine "whether, based on the applicable law, a constitutional violation occurred." *Dickerson*, 101 F.3d at 1157. If a constitutional violation is found, we next consider whether the violation involved "clearly established constitutional rights of which a reasonable person would have known." *Id.* at 1158 (quoting *Christophel v. Kukulinsky,* 61 F.3d 479, 484 (6th Cir. 1995)). To determine whether a constitutional right is "clearly established," we "'look first to the decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits.'" *Id.* (quoting *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994) (citation omitted)). Under this framework, to plead a proper claim under 42 U.S.C. § 1983, "a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law," *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992), such that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

After determining that a constitutional right is clearly established, the final step in our qualified immunity analysis is to inquire "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the official] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Dickerson*, 101 F.3d at 1158 (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.

to July 1996 only further suggests that the defendants may be exaggerating their response to the potential security threats posed by permitting Flagner to grow his beard and sidelocks in a manner that is consistent with his religious beliefs.

Our reversal of the district court's denial of summary judgment based on qualified immunity does not preclude Flagner's as-applied challenge to the Ohio prison grooming regulation from proceeding. Accordingly, we **REMAND** to the district court for further consideration of Flagner's claims for declaratory and injunctive relief.

## IV. CONCLUSION

Based upon the foregoing, the district court's order denying the defendants' motion for summary judgment based on qualified immunity is **REVERSED** insofar as Flagner seeks damages. Flagner may, however, continue with his action seeking declaratory and injunctive relief against the application of the Ohio prison grooming regulation, having presented a genuine issue of material fact regarding the validity of the defendants' penological justifications for the regulation. We therefore **REMAND** to the district court to allow Flagner's as-applied challenge seeking declaratory and injunctive relief to proceed.

we noted earlier, courts generally defer to the expertise of prison officials "in the adoption and execution of polices and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish,* 441 U.S. at 547. In *Brown v. Johnson,* we concluded that "[a]s long as prison authorities present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs." *Brown v. Johnson*, 743 F.2d 408, 412-13 (6th Cir. 1984), *cert. denied sub nom. Inosencio v. Johnson*, 469 U.S. 1215 (1985). However, we afford no deference to the policies and judgments of prison officials if there is "substantial evidence in the record to indicate that the officials have exaggerated their response." *Pell,* 417 U.S. at 827.

Consistent with these principles, in *Whitney v. Brown* we held that a prison policy which prohibited the intercomplex travel of six Jewish inmates for Sabbath services and annual Passover Seders was "an exaggerated response to speculative security objectives, and, therefore it [wa]s invalid." *Whitney,* 882 F.2d at 1078. In *Whitney,* we rejected a conclusory approach where "anything prison officials can justify is valid because they have somehow justified it." *Id.* at 1074. Like the defendants in *Whitney*, the defendants here have articulated a list of generalized concerns regarding the impact of exempting Flagner from the grooming regulation. Flagner, however, has demonstrated the absence of a factual basis for these penological concerns and has thereby called into question the credibility of those assertions. Resolution of these credibility issues can be best achieved by the trial judge during further proceedings regarding Flagner's as-applied challenge to the grooming regulation.

Flagner is the only Orthodox Jew at MaCI, which has a population exceeding 2,500 inmates, who is requesting an exemption from the Ohio prison grooming regulation based on religious reasons. J.A. at 274-75 (Wingard Dep.). The fact that the defendants managed to wait five years before forcibly cutting Flagner's beard and sidelocks from June 1991

1994)). "Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights." *Id.*

Turning to the first prong of our qualified immunity analysis, we must ask whether a constitutional violation occurred. The Supreme Court has recognized that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Specifically, the Supreme Court has held that inmates retain First Amendment rights, *see Pell v. Procunier,* 417 U.S. 817, 822 (1974), including the right to free exercise of religion. *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (concluding that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty"). A prisoner alleging that the actions of prison officials violate his religious beliefs must show that "the belief or practice asserted is religious in the person's own scheme of things" and is "sincerely held." *Kent v. Johnson,* 821 F.2d 1220, 1224 (6th Cir. 1987).

In this case, the sincerity of Flagner's religious beliefs is not in dispute. Flagner alleges that application of §§ 5120-9-25(D) and (F) violated his First Amendment free exercise rights. He asserts that despite his efforts to prevent prison officials from violating the tenets of his religious faith, the defendants forcibly cut his beard and sidelocks in 1996 and 1998.

The Supreme Court has held that in most circumstances, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish,* 441 U.S. at 547. "To ensure that courts afford appropriate deference to prison officials," the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test

less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). In *Turner v. Safley*, the Supreme Court articulated the proper standard as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

We agree with the district court's conclusion in its March 23, 1999 Order adopting the magistrate judge's Report and Recommendation that the proper standard to apply in prisoner cases challenging restrictions on the free exercise of religion is supplied by the Supreme Court's decision in *Turner*, not by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).[4] In *Smith*, the Supreme Court concluded "that generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." *Id.* at 886 n.3. Following the *Smith* decision, Congress enacted the Religious Freedom Restoration Act (RFRA) which was later held unconstitutional by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 511 (1997). As the district court and magistrate judge correctly recognized, after the *Boerne* decision, our Circuit has consistently applied the pre-RFRA standard set forth in *Turner* to evaluate challenges by prisoners to restrictions on the free exercise of religion. *See, e.g., Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (applying the *Turner* standard to evaluate First Amendment free exercise challenges to prison regulations).

As we explain in Part C, we believe that Flagner has presented sufficient evidence that application of the grooming regulation would violate his constitutional rights. We agree with the district court that "material issues of fact exist as to

---

[4]This Order dated March 23, 1999 was listed in the defendants' Notice of Appeal but was not included by the parties in the Joint Appendix.

**2. *Turner* Factors Two, Three, and Four.**

Looking to the second *Turner* factor, there are no alternatives that remain open to Flagner in the exercise of his religion should the grooming regulation be upheld. None of the other aspects of Flagner's religion could ever compensate for the fact that an essential tenet of his religious beliefs prevents him from cutting his beard or sidelocks, and that enforcement of the grooming regulation would require the plaintiff to violate this very tenet.

As to the third *Turner* factor, the evidence in the record shows that no prison resources were ever diverted to accommodate the plaintiff and the then-exempted Native American inmates. J.A. at 294 (Wingard Dep.). The defendants also admitted that no extra guards were ever hired or overtime authorized to respond to additional security risks by Flagner and the other then-exempted inmates. J.A. at 260, 298 (Wingard Dep.). There is also no evidence in the record that other inmates resented Flagner because he was allowed at one time to grow out his beard and sidelocks.

The lack of an undue impact "on guards and other inmates, and on the allocation of prison resources generally," *Turner*, 482 U.S. at 90, also speaks to the final factor which is that having Flagner search his own beard is an "alternative that fully accommodates the plaintiff at *de minimis* cost to valid penological interests." *Id.* at 91. The defendants have already admitted that the accommodation of Flagner and the four Native American inmates did not cause the institution any financial hardship. J.A. at 294 (Wingard Dep.).

On balance, the second, third, and fourth *Turner* factors also weigh heavily in favor of Flagner because they demonstrate a lack of viable alternatives for Flagner to exercise his religion should the regulation be upheld, as well as the absence of an undue negative impact on the prison community and its resources. Thus, looking at the totality of all four *Turner* factors, Flagner has presented sufficient evidence which raises serious questions concerning the validity of the defendants' asserted penological interests. As

upon escape by changing his hair and beard length and/or style." J.A. at 89 (Wingard Aff., ¶ 24). The defendants argue that it is administratively burdensome to update continually their record of inmate photographs if inmates were allowed to alter their appearance by growing long hair or thick facial hair. The defendants further contend that "it is essential to distribute an accurate picture of an escapee as quickly as possible after an escape and having to distribute multiple pictures is more difficult." J.A. at 90 (Wingard Aff., ¶ 25).

The grooming regulation, however, does not completely prevent the risk of an escapee altering his own appearance after escaping from prison. With respect to Flagner, specifically, there is no evidence in the record that he has ever attempted to escape from prison. In addition to a photograph of Flagner, the defendants also have on file four professionally-made sketches of him bearing various beard and sidelock lengths and one sketch of Flagner with no facial hair at all. In the event that Flagner ever escaped from prison, these sketches would help to identify him because they show a range of his possible appearances.

Finally, the defendants argue that "[l]ong hair can lead to increased plumbing problems by making clogged drains more frequent." J.A. at 91 (Wingard Aff., ¶ 27). Even if we were to assume this to be true as a general matter, there is no evidence in the record that any clogged drains were ever attributed to Flagner's beard or sidelocks.

Based on the defendants' asserted justifications, followed by Flagner's demonstration of the lack of a factual basis for those justifications as applied to himself, the first *Turner* factor weighs heavily in favor of Flagner. The defendants have not had any security problems with Flagner, nor have they spent additional resources to provide extra security to perform searches of his beard and sidelocks. The defendants have multiple sketches of Flagner for ready distribution if he ever escaped. Finally, nothing in the record suggests that Flagner's beard and sidelocks have ever clogged the sinks or showers of the prison.

the legitimacy of defendants' proffered justifications for enforcing the hair regulation against plaintiff. Plaintiff has come forward with evidence from which a trier of fact could reasonably conclude that defendants' enforcement of the grooming regulation against plaintiff was an exaggerated response to or not done for the asserted security concerns." J.A. at 236 (D. Ct. Order of 8/24/99). Under the Supreme Court's decision in *Johnson* we would not be able to exercise appellate jurisdiction because the Court has held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319-20. In this case, with respect to the first prong of the qualified immunity analysis, there are genuine issues of material fact as to whether a constitutional violation occurred.

Our qualified immunity analysis, however, does not end here. We must now consider the district court's legal conclusion that "[a]t the time of plaintiff's initial forced haircut in 1996, the law was *clearly established* that prisoners retain the right to religious freedom and that prison officials may not deny inmates a reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." J.A. at 235 (D. Ct. Order of 8/24/99) (quotation omitted) (emphasis added). In light of our decision in *Pollock*, we hold that the district court erred in concluding that the law was clearly established.

Flagner bears the burden "to allege and prove that the defendant official violated a clearly established constitutional right." *Buckner*, 36 F.3d at 539. In *Pollock v. Marshall*, we upheld the application of an earlier version of the challenged Ohio prison grooming regulation in an action involving a Lakota American Indian who sought to enjoin prison officials from cutting his hair in violation of his religious beliefs. *See Pollock v. Marshall*, 845 F.2d 656, 659-60 (6th Cir.), *cert. denied*, 488 U.S. 897 (1988). We held that "[a]fter balancing

the defendant's interest in keeping prisoners' hair short against the right of the plaintiff to exercise the religion of the Lakota Indians, . . . the regulation restricting hair length, *as applied* to the plaintiff, is not unconstitutional." *Id.* (emphasis added). The defendants in *Pollock* raised several legitimate penological concerns such as, "[q]uick identification, removal of a place to hide small contraband, prevention of sanitation problems," and increased risk of sexual attacks on inmates with longer hair because "[l]onger hair increases the attractiveness of an inmate to other inmates." *Id.* at 659.

Although *Pollock* involved a challenge by a Lakota American Indian to an earlier version of § 5120-9-25(F) and in this case, Flagner, an Hasidic Orthodox Jew, brings a challenge to the current §§ 5120-9-25(D) and (F), "it need not be the case that 'the very action in question has previously been held unlawful." *Dickerson*, 101 F.3d at 1158 (quoting *Anderson*, 483 U.S. at 640). To deny qualified immunity protection to the defendants, the law requires that "in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson*, 483 U.S. at 640).

Based on our decision in *Pollock* which upheld an application of the challenged prison regulation, we conclude that Flagner's right to grow his beard and sidelocks in contravention of the Ohio prison grooming regulation at the time of his forced cutting was not "sufficient[]y clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.2d at 1042 (quoting *Anderson*, 482 U.S. at 640). We also recognize that our decision in *Pollock* has been followed in several unpublished opinions upholding the application of the Ohio prison grooming regulation at issue in this case. Because Flagner has not satisfied his burden to establish that the "defendant official[s] violated a clearly established constitutional right," *Buckner*, 36 F.3d at 539, the defendants are entitled to qualified immunity solely with respect to Flagner's money damages claims. It is thus unnecessary for us to consider the final prong of the qualified immunity analysis. Accordingly,

prisons by reducing the danger of injury to staff members and the tension that would otherwise follow from the increased close and/or physical contact resulting from the more frequent and more invasive searches that would be necessary to deal with contraband in inmates' hair." J.A. at 82 (Wingard Aff., ¶ 8). This rationale, however, is completely undermined by the fact that these cursory searches required minimal, if any, physical contact between the prison staff and Flagner, and involved Flagner running his own fingers through his beard and sidelocks, which took approximately two to three seconds to perform. Furthermore, the defendants have only searched Flagner's beard and sidelocks on a few occasions. Assuming that "[t]he potential for injury to staff increases in direct proportion to the extent of their physical contact and physical proximity to inmates," J.A. at 82 (Wingard Aff., ¶ 8), given the minimal contact between the staff and Flagner and the infrequency of searches, which he essentially performs on himself, the risk of increased injury to the defendants caused by exempting Flagner from the regulation appears to be nominal.

Next, the defendants proffer that the grooming regulation is justified because it reduces gang activity by suppressing "gang identifiers." J.A. at 87 (Wingard Aff., ¶ 17). According to Defendant Wingard, the regulation promotes uniform appearance "that allows corrections officials to more readily detect the use of hair as an identifier"; moreover, "limitations on the quantity of hair on an inmate[]'s head limits the number of ways in which the hair style can be modified for use as an identifier." J.A. at 88 (Wingard Aff., ¶ 21). Although it may be true that the challenged grooming regulation, as a general matter, helps alleviate the proliferation of "gang identifiers," there is no evidence in the record that Flagner's beard and sidelocks have ever been mistaken for a "gang identifier."

Next, the defendants assert that the grooming regulation is needed to promote ready identification of escaped inmates. Allowing an inmate to grow "long hair or a thick, full beard can [permit the inmate to] dramatically alter his appearance

forward to justify it." *Turner*, 482 U.S. at 89 (quotation omitted). Defendant Wingard stated that the prison grooming regulation is necessary because "[l]ong hair and thick, full beards and sideburns provide good hiding places for such contraband as drugs and weapons." J.A. at 80 (Wingard Aff., ¶ 4). In the past, Defendant Wingard has recovered items such as tobacco, marijuana, and a razor blade from the hair of Ohio inmates. J.A. at 80 (Wingard Aff., ¶ 4). However, with respect to Flagner specifically, no contraband has ever been recovered by prison staff during any search of his beard and sidelocks.

The defendants next assert that the grooming regulation is necessary to promote their "compelling interest in maintaining security within Ohio's prisons by freeing staff members from the increased demands on their time that would otherwise result from the more frequent, wide ranging and lengthier searches that would be necessary to attempt to control contraband." J.A. at 81 (Wingard Aff., ¶ 6). Defendant Wingard continued, "additional staff are simply not available to conduct the more frequent and time consuming searches that would be necessary if the Hair Length Regulations were not consistently enforced." J.A. at 82 (Wingard Aff., ¶ 7). Despite this facially appealing justification, Defendant Wingard conceded that no additional staff members were ever hired and no overtime was ever authorized to accommodate increased security demands caused by Flagner and the four Native American inmates when they were exempted from the regulation. J.A. at 260, 298 (Wingard Dep.). Moreover, the defendants are unaware of any additional security precautions that were ever taken on account of Flagner that exceeded the security precautions taken for inmates who complied with the hair length regulation. J.A. at 260 (Wingard Dep.). Defendant Wingard was also unaware of any security problems specifically attributed by prison staff to Flagner's beard and sidelocks. J.A. at 260 (Wingard Dep.).

The defendants also contend that the regulation "further[s] the compelling interest in maintaining security in Ohio's

we **REVERSE** the district court's denial of summary judgment to the defendants based on qualified immunity.

## C. Declaratory and Injunctive Relief

The defense of qualified immunity protects officials from individual liability for money damages but not from declaratory or injunctive relief. *See Collyer v. Darling*, 98 F.3d 211, 228 n.18 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997); *Cagle v. Gilley*, 957 F.2d 1347, 1350 (6th Cir. 1992). Thus, our reversal of the district court's denial of summary judgment based on qualified immunity does not preclude Flagner from going forward with his as-applied challenge to the Ohio prison grooming regulation insofar as he seeks declaratory and injunctive relief. "In considering a challenge to a prison policy as applied, the proper inquiry is whether the actions of the prison officials are reasonably related to legitimate penological interests." *Skelton v. Pri-Cor, Inc.,* 963 F.2d 100, 103 (6th Cir. 1991), *cert. denied*, 503 U.S. 989 (1992) (citing *Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

Flagner seeks declaratory and injunctive relief to prevent the defendants from forcibly cutting his beard and sidelocks in the future. Although we relied on our decision in *Pollock* to conclude here that the defendants are entitled to qualified immunity with respect to Flagner's damages claims, our holding in *Pollock* does not necessarily resolve the question of whether the defendants may in the future, continue forcibly to cut Flagner's beard and sidelocks.

Inmates retain rights to free exercise of religion. Prison officials may impinge on these constitutional rights only if the regulation "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. While courts should generally defer to the expertise of prison officials in matters involving prison administration, this deference is only afforded "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response." *Wolfish*, 441 U.S. at 548. The plaintiff here, unlike the plaintiff in *Pollock* who did not challenge the factual

underpinnings of the prison officials' justifications, has presented sufficient evidence to raise questions about the validity of the defendants' asserted penological interests.

As the Supreme Court directed in *Turner v. Safley*, courts employ a four-factor analysis to determine whether a prison regulation is reasonably related to legitimate penological interests.[5] *See Spies*, 173 F.3d at 403 (citing *Turner*, 482 U.S. at 89). These factors are not necessarily weighed evenly, *see id.* at 403-04, but rather they are guidelines for the court to assess whether the prison officials' actions are reasonably related to a valid penological basis. *See Whitney v. Brown*,

---

[5] Judge Nelson's reliance on *Spies v. Voinovich*, 173 F.3d 398, 403-04 (6th Cir. 1999), for the proposition that under *Turner*, courts are not to subject challenged prison regulations to "a four-factor analysis tailored to the plaintiff's individual circumstances" ignores controlling Supreme Court precedent. In *Thornburgh v. Abbott*, the Supreme Court considered both a facial and an as-applied challenge to a federal prison regulation concerning the receipt of subscription publications by inmates. *See Thornburgh v. Abbott*, 490 U.S. 401, 403 (1989). Applying the *Turner* analysis, the Court concluded that the prison regulation at issue was facially valid; however, the Court remanded to the district court for further examination of the plaintiffs' as-applied challenges concerning 46 publications introduced at trial. *Id.* at 404. Under Judge Nelson's interpretation of *Turner*, as-applied challenges to prison regulations would be virtually impossible. The Supreme Court's decision in *Abbott*, however, demonstrates that under *Turner,* plaintiffs may pursue as-applied challenges to facially valid prison regulations.

Moreover, in *Spies*, we upheld the constitutionality of a prison regulation prohibiting inmate-led groups, concluding that *Turner* factors three and four "do not cut in favor of Spies, for he has also not demonstrated that the safety concerns of prison officials related to accommodating his requests are exaggerated and does not offer any 'alternative means' by which prison officials can mollify their security concerns." *Spies*, 173 F.3d at 406. Thus, our own analysis in *Spies* demonstrates that "the plaintiff's individual circumstances" are indeed relevant in applying the *Turner* analysis. Unlike the inmate in *Spies*, Flagner has presented sufficient evidence that the prison officials' response to a supposed security concern was exaggerated. *See* discussion *infra* Part III.C.1. Flagner has also offered an alternative means which would accommodate his religious beliefs "at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 91; *see also* discussion *infra* Part III.C.2.

---

882 F.2d 1068, 1076 (6th Cir. 1989). Under the first factor, the court must consider whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quotation omitted). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90.

The final three *Turner* factors should be balanced together. The second *Turner* factor to consider is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. The third *Turner* factor we consider "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* With respect to the fourth *Turner* factor, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* Likewise, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

### 1. *Turner* Factor One

In consideration of the first *Turner* factor, we now ask whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put