Cornelius Wayne **HOEVENAAR**,
Plaintiff,

v.

Alan **LAZAROFF**, Defendant.

No. 03–CV–190.

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 7, 2003.

David A. Singleton, Cincinnati, OH, for Plaintiff.

Todd Robert Marti, Ohio Attorney General, Columbus, OH, for Defendant.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on the Plaintiff's Motion for a Preliminary Injunction. On June 9 and 10, 2003, this Court held a hearing on the Plaintiff's Motion. Through his Motion, the Plaintiff, a prisoner at the Madison Correctional Institute ("Madison"), seeks to prevent the Defendant, Alan Lazaroff, the Warden at Madison, and his agents, from cutting his hair in violation of his religious beliefs.

For the following reasons, the Plaintiff's Motion for a Preliminary Injunction is hereby **GRANTED** to the extent that the Defendant is **ENJOINED** from preventing the Plaintiff from growing a kouplock in accordance with his religious beliefs, pending the outcome of the final litigation of this matter.

### II. BACKGROUND

The Plaintiff, Cornelius Wayne Hoevenaar, is a Native American of Cherokee ancestry. Hoevenaar is sixty-five years old, and is currently serving a life sentence at Madison. He suffers from a heart condition, diabetes, and neuropathy, a diabetic condition that he describes as causing the nerves in his feet to die, making him feel like he is "walking on stumps." Hoevenaar is classified as a medium security inmate at Madison.

Hoevenaar embraced his Native American heritage in 1998, and now practices Native American religion. As he explained in detail at the hearing on this matter, growing his hair long is an essential part of his Native American religious beliefs and practices. According to his religious beliefs, his ancestors guide him in life as well as in his religious practice. As such, connecting to his ancestors is a key aspect of his religion. Another key aspect of his religion involves the ceremonies that he regularly performs to help him connect to his ancestors. Hoevenaar testified that having long hair is essential to his religious practices because, according to his beliefs, hair is the key to receiving positive ener-

gies and to connecting to his ancestors through the ceremonies he performs. He believes that his hair is also what connects him to the "Red Road of Life," or the path to spirituality. The Defendant, Alan Lazaroff, does not doubt the sincerity of Hoevenaar's religious beliefs.

Hoevenaar began growing his hair long for religious reasons in 2000. At that time, he was incarcerated at the Lebanon Correctional Institution ("Lebanon"). While at Lebanon, he was permitted to grow his hair long without incident. Then, in September 2001, Hoevenaar was transferred to Madison.

Madison's grooming regulation, as it relates to hair, provides: "Haircuts shall be provided as needed. Hair and hairstyles shall be clean, neatly trimmed and shall not extend over the ears or the shirt collar. Hair and hairstyle shall not protrude more than three inches from the scalp. Braids and plaits may be worn subject to the limitations of this rule...." Ohio Admin. Code § 5120–9–25(D) (Anderson 1998).[1] Upon his arrival at Madison, staff at that prison told Hoevenaar he would have to cut his hair to comply with this regulation. Hoevenaar testified that he complied because he "did not want to create waves."

In July 2002, after his hair had grown back, Madison staff again directed Hoevenaar to cut his hair. Initially, he refused, based on the importance of his hair to his religious beliefs and practices. As a punishment for this refusal, Hoevenaar was placed in segregated confinement. After one week, Hoevenaar agreed to have his hair cut so that he could be released from confinement. During the week in which he was confined, Hoevenaar had been unable to practice his religion.

Hoevenaar filed a Complaint with this Court on March 3, 2003. Plaintiff avers the following claims: (1) violation of 42 U.S.C. § 1983 by virtue of the Defendant's infringement of the Plaintiff's rights under the First Amendment to the United States Constitution; and (2) violation of 42 U.S.C. § 2000cc–1, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). This matter is now before the Court on the Plaintiff's Motion for a Preliminary Injunction. The Plaintiff seeks to enjoin the Defendant, Alan Lazaroff, the Warden at Madison, from forcing him to cut his hair again in violation of his religious beliefs. Although he seeks to enjoin Lazaroff from cutting his hair at all, Hoevenaar has said that he is willing to grow a "kouplock," which he described as a two-inch square of hair at the base of the skull, and have the rest of his hair cut.

### III. DISCUSSION

In determining whether to issue a preliminary injunction, the Court is to examine: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether irreparable harm could result to the movant if the injunction is not issued; (3) whether substantial harm could result to others if the injunction is issued; and (4) whether the public interest would be served by issuing the injunction. *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir.2003) (citation omitted). The elements are factors to be balanced against each other, but each element need not be satisfied to issue a preliminary

---

1. A prior version of this same regulation explicitly granted the prison warden the authority to make an exception to this rule based on a prisoner's religious beliefs. Specifically, that provision stated: "These limitations may be modified by the managing officer upon a showing by the inmate that a sincerely held belief of such inmate, deeply rooted in religion, conflicts with these limits." Ohio Admin. Code § 5120–9–25 (Anderson 1983). This provision was revised into its current form on August 26, 1991.

injunction. *Id.* (citing *Mich. Bell Tel. Co. v. Engler,* 257 F.3d 587, 592 (6th Cir. 2001)).

### A. Likelihood of Success on the Merits

### 1. Likelihood of Success Under RLIUPA

#### a. *Applicability of RLIUPA*

The Plaintiff brings his claim 42 U.S.C. § 2000cc–1, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). That statute states, in pertinent part:

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(b) Scope of application

This section applies in any case in which—

(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc–1 (West Supp.2003).

In his Post–Trial Memorandum in Opposition to Injunctive Relief, the Defendant argues that the Plaintiff cannot succeed on his RLUIPA claim because he has failed to demonstrate either that the grooming regulation is imposed in a program or activity that receives Federal financial assistance,

or that the grooming regulation affects, or that the removal thereof would affect, interstate commerce. *See Johnson v. Martin,* 223 F.Supp.2d 820, 829–30 (W.D.Mich. 2002) (discussing the statutory requirement that the party invoking RLIUPA prove that one of the threshold conditions is present).

In response to that argument, the Plaintiff has filed, as an exhibit attached to his Post–Trial Reply Brief, joint stipulations of fact from an unrelated case involving the Defendant and another party. In those stipulations, the Defendant admits that the Ohio Department of Rehabilitation and Correction ("ODRC"), Lazaroff's employer, regularly receives federal funding through grants for which it applies. In response to that Post–Trial Reply Brief, the Defendant has filed a Motion to Strike, in which he seeks to strike the stipulations attached as an exhibit to Plaintiff's Post–Trial Reply Brief because the Plaintiff failed to introduce that exhibit prior to or during the preliminary injunction hearing. In response to the Motion to Strike, the Plaintiff has not only argued that the exhibit containing the stipulations should not be stricken from the record, but has also filed a Motion to Amend his Complaint to state the following:

Plaintiff is confined in an institution as defined by the Civil Rights of Institutionalized Persons Act (42 U.S.C. § 1997).

The Ohio Department of Rehabilitation and Correction ("ODRC"), Defendant Lazaroff's employer, regularly applies for and receives federal funding.

RLUIPA applies in this case because the burden on religion is imposed in a program that receives federal funding.

ODRC also has established business agreements and regularly conducts transactions in interstate commerce.

Plaintiff orders books and other items relating to the practice of his religion from businesses located outside the state of Ohio.

RLUIPA applies in this case because the burden on religion (or the burden's removal) affects interstate commerce.

■■■ Federal Rule of Civil Procedure 12(f) governs Motions to Strike, and provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The Court finds that the material contained in the exhibit sought to be stricken is neither redundant, nor immaterial, nor impertinent, nor scandalous. Furthermore, although the Defendant argues that the Plaintiff should not be permitted to introduce evidence necessary to prove an element of his case after the record has been closed, it is not unusual for a preliminary injunction hearing to be held without introducing all evidence that is necessary to a particular party's case. Indeed, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 400 (6th Cir.1997) (quoting *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Therefore, the Court **DENIES** the Defendant's Motion to Strike.

■■■ Leave to amend a complaint should be freely granted when justice so requires. FED.R.CIV.P. 15(a). Here, it appears that justice requires granting the Plaintiff's Motion to Amend his Complaint so that the Plaintiff may set forth in his Complaint the facts that provide the basis for his RLUIPA claim. With respect to the Motion for a Preliminary Injunction, the amendment of the Plaintiff's Complaint

is necessary to aid the Court in its determination of whether the Plaintiff has demonstrated a strong likelihood of success on the merits of his case. Therefore, the Court **GRANTS** the Plaintiff's Motion to Amend his Complaint.

■■■ The language of RLUIPA indicating that the substantial burden must be imposed in a program or activity that receives federal financial assistance was intended to track the language of other civil rights legislation that is promulgated pursuant to Congress's authority under the Spending Clause of the United States Constitution. 146 CONG. REC. E1563 (daily ed. Sept. 22, 2000) (extension of Remarks by Rep. Canady). Indeed, Senators Orrin Hatch and Ted Kennedy explicitly stated that the law's protections "are properly confined to each federally assisted 'program or activity,' which is defined by incorporating a subset of the definition of the same phrase in Title VI of the Civil Rights Act of 1964." 146 CONG. REC. S7775 (daily ed. July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy).

Title VI of the Civil Rights Act of 1964 defines "program or activity" as "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d–4a (1994). In accordance with this language, Senators Hatch and Kennedy recognized that, "[i]n most applications, ['program or activity'] means the department that administers the challenged land use regulation or the department that administers the institution in which the claimant is housed." 146 CONG. REC. S7775 (daily ed. July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Based on the representations in the Plaintiff's Amended Complaint, as well as the representations made in the stipulations at-

tached as an exhibit to the Plaintiff's Reply to the Defendant's Post–Trial Brief, the Court finds that it is likely that the Plaintiff will be able to demonstrate, in a trial on the merits, that the ODRC, as the state agency that employs Defendant Lazaroff and houses the Plaintiff, receives Federal financial assistance.

Therefore, the Court finds that it is likely that the Plaintiff will succeed in demonstrating that the RLUIPA applies to the ODRC and, accordingly, to the particular issues in this matter.

### b. Substantial Burden

■ Long hair is a fundamental aspect of Hoevenaar's sincerely held religious beliefs and practices. By requiring him to cut his hair periodically to prevent his hair from growing past his ears or his shirt collar, Madison's grooming regulations prevent Hoevenaar from engaging in this fundamental aspect of his religion. The Plaintiff is likely to succeed, therefore, in demonstrating that the grooming regulations impose a substantial burden on his religious exercise. *Winburn v. Bologna,* 979 F.Supp. 531, 535 (W.D.Mich.1997) (holding that, to satisfy the substantial burden requirement of the Religious Freedom Restoration Act ("RFRA"), RLUIPA's predecessor, the plaintiff had to show that the government's action interfered with a tenet or belief that is central to the religious doctrine) (citing *Stefanow v. McFadden,* 103 F.3d 1466 (9th Cir.1996)).[2]

### c. Compelling State Interest

■ Under RLUIPA, once the plaintiff has demonstrated that a substantial burden is imposed on his religious exercise in a program or activity that receives federal funding, the burden shifts to the defendant to demonstrate that the substantial burden furthers a compelling state interest, and is the least restrictive means available for furthering that interest. 42 U.S.C. § 2000cc–2(b) ("If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion."). In evaluating whether the Defendant has satisfied this burden, the Court is to accord great deference to the views of prison administrators and officials regarding these issues. This deference is mandated by the legislative history of RLUIPA, which indicates that its framers adopted the legislative history of the Religious Freedom Restoration Act ("RFRA"), RLUIPA's predecessor. The particular aspect of the RFRA legislative history adopted by the RLUIPA framers indicated that Congress did not intend to limit the high degree of deference that had been given to prison officials' analyses of operational matters prior to RFRA's enactment. A Joint Statement by Senators Hatch and Kennedy regarding the adoption of the bill which was enacted as RLUIPA explained:

> The compelling interest test is a standard that responds to facts and context. What the Judiciary Committee said about that standard in its report on RFRA is equally applicable to This Act:
>> "[T]he committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regu-

---

**2.** The Defendant has not argued that the Plaintiff is unlikely to succeed on this aspect of his claim.

lations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

"At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements."

146 Cong. Rec. S7775 (daily ed. July 27, 2000) (citing Senate Report 103–111 at 10 (1993), U.S.Code Cong. & Admin.News 1993, pp. 1892, 1900).

■ In light of the deference to be accorded Defendant's Lazaroff's views based on his experience and expertise as a prison administrator, the Court finds that Lazaroff is significantly likely to satisfy his burden of demonstrating that the grooming regulation furthers a compelling state interest. In particular, he will likely be able to demonstrate that the grooming regulation furthers the government's interest in identifying prison inmates and suppressing contraband in prisons.

This Court and others have concluded that the state's interests in identifying inmates and in suppressing contraband in prisons are compelling government interests. *See Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir.1997); *Harris v. Chapman*, 97 F.3d 499, 503–04 (11th Cir.1996); *Davie v. Wingard*, 958 F.Supp. 1244, 1249–50 (S.D.Ohio 1997). With respect to contraband, it is particularly important for prison officials to be able to suppress weapons, which may be used to harm either inmates or the prison staff, and drugs, which may alter an inmate's behavior, as well as his sense of reality, making him more difficult to control. The grooming regulation fur-

thers the interest in suppressing these and other contraband items by decreasing the possibility that an inmate will be able to hide contraband items in his hair.

With respect to the interest in identifying inmates, it is significant to note that this interest is compelling not only while the inmate is in prison, but also in the event that the inmate escapes from prison. Within the prison system, it is important for prison staff to be able to identify inmates quickly so that they can assure that medicine and commissary goods are properly distributed, and so that they can verify that inmates appear at their assigned work and housing locations. The ability to identify inmates quickly within the prison also relates to the ability of prison staff members to account for all inmates within the prison, and to deal with prison misconduct. In the event that an inmate escapes from prison, both prison officials and members of the public must be able to identify an escaped inmate quickly and easily to facilitate his apprehension and return. The grooming regulation furthers this interest by decreasing the ways in which an inmate, either within prison or upon escape, can alter his appearance by cutting or changing his hair style.[3] The regulation also furthers this interest because, if an inmate has regulation-length hair, he is unable to use his hair to hide scars, blemishes, or other features by which he can be identified.

The Plaintiff argues that the grooming regulation is not sufficiently connected to the compelling interests set forth by the Defendant to establish that either interest is actually furthered by the grooming regulation. With respect to the interest in

---

**3.** During the preliminary injunction hearing, witnesses for both parties acknowledged that long hair impacts an individual's profile, such that cutting long hair can change others' perception of the profile. Witnesses also acknowledged that individuals with long hair have a greater number of ways of altering their appearance than individuals with short hair.

suppressing contraband, the Plaintiff argues that the grooming regulation does not further that interest in light of the fact that it is unlikely that any prisoner would secrete contraband in his hair because, as one witness testified, there are so many other better places to hide contraband.[4] He also notes that the regulation does nothing to further the interest in suppressing contraband as a practical matter because contraband can be hidden even in regulation-length hair. With respect to the interest in identifying inmates, Hoevenaar contends that the grooming regulation does not further that interest in light of the numerous ways in which an inmate can alter his appearance, of which altering his long hair is merely one.[5] He points out that this is particularly true in light of the fact that the grooming regulation permits inmates to grow facial hair and to braid or plait their regulation-length hair. He indicates that the ability shave or dye a beard, or to comb out a braid or plait into an afro-type hair style, gives inmates as many, if not more, ways of altering their appearance. He argues that, if these things are permitted, then the grooming regulation prohibiting long hair could not really be intended to further the interest in identifying inmates. Rather, he asserts that, for all of these reasons, both the interest in identifying inmates and the interest in suppressing contraband are simply impermissible post hoc rationalizations for the grooming regulation.

The Court rejects the Plaintiff's arguments that the grooming regulations are not sufficiently related to the government's compelling security interests for the Defendant to meet his burden of establishing that the regulation furthers those interests. Although the grooming regulations do not serve as an absolute guarantee that an inmate will not be able to alter his appearance upon escape, or that he will not be able to secrete contraband in his hair, they reduce the likelihood of either of those security problems. While there may be numerous ways in which an inmate can alter his appearance, the grooming regulations, by eliminating one way in which an inmate can alter his appearance with little time or effort, at least decrease the likelihood that an inmate would alter his appearance. Similarly, while there may be many places for an inmate to hide contraband on his person, the grooming regulations eliminate one place for doing so, and thereby decrease the possibility that an inmate will, in fact, secrete contraband on his person. Thus, the Plaintiff has failed to demonstrate that the compelling justifications set forth by the Defendant constitute mere post hoc rationalizations for the grooming regulations.

Therefore, the Court concludes that the Defendant will likely succeed in demonstrating that the grooming regulations further compelling government interests.

### d. Least Restrictive Means

The primary dispute in this matter is whether the grooming regulation is the least restrictive means of furthering the Defendant's interests in suppressing contraband and in identifying inmates.

The Plaintiff argues that the grooming regulation is not the least restrictive means of furthering these interests, and offers suggestions as to how the security interests might be furthered without infringing on the ability of inmates such as Hoevenaar to exercise their First Amend-

---

4. Indeed, the Plaintiff points out that one of the Defendant's witnesses testified that probably less than one percent of contraband is ever recovered from inmates' hair.

5. For example, even an inmate with regulation-length hair has the ability to alter his appearance by shaving some or all of his hair, dyeing his hair, or purchasing a wig, glasses, or some other disguise.

ment rights by growing their hair long. First, he asserts that the Defendant can further the compelling interest in suppressing contraband by allowing inmates to grow their hair long, but requiring inmates with long hair to be subjected to periodic hair searches, which could be conducted by the prisoners themselves under the careful watch of prison guards. *See Flagner v. Wilkinson,* 241 F.3d 475, 485 (6th Cir.2001) (recognizing that no problems had resulted when an inmate had been permitted to search his own hair in view of prison staff, which only took a few seconds to accomplish). The Plaintiff explains that this would be conducted in a manner similar to the way in which strip searches are currently conducted, whereby the inmate is permitted to manipulate his body cavities as the prison staff observes.

Second, the Plaintiff states that the Defendant can further the compelling interest in identifying inmates by allowing inmates to grow their hair long, but re-photographing inmates with their long hair, and retaining photographs of the inmate with both long and short hair on file. *See Estep v. Dent,* 914 F.Supp. 1462, 1467 (W.D.Ky.1996) (granting preliminary injunction to Orthodox Jew who challenged the cutting of his sidelocks under RFRA based on the finding that shaving the sidelocks was not the least restrictive means of furthering the interest in identification because the inmate could be photographed with and without sidelocks). The Plaintiff points out that, were an inmate with long hair to escape from prison, the authorities could release pictures of the inmate with both long and short hair. *See Flagner,* 241 F.3d at 486 (concluding that releasing multiple images of a prisoner would help, rather than hinder, apprehension of an escapee by showing the range of his possible appearances). The Plaintiff notes that re-photographing a prisoner after his hair grows to a certain length would comport with the prison's current practice, as required by the grooming regulation, of re-photographing an inmate whenever his appearance significantly changes in any manner. Ohio Admin. Code § 5120–9–25(G) ("A new photo shall be taken whenever in the judgment of the managing officer or designee any significant change in physical appearance has taken place.").

Finally, the Plaintiff argues that the fact that the grooming regulation is not the least restrictive means of furthering the prison's security interests is demonstrated by the fact that the regulation, and the inability of the warden to grant an exemption, applies to all inmates equally, regardless of their security classification. The Plaintiff argues that, whether an exemption to the grooming regulation should be granted should be a fact-based determination, taking into account a particular inmate's security classification. In his case, he states that the fact that he is a medium security prisoner whose ability to use his feet is deteriorating due to his diabetes indicates that the granting of an exemption would be proper and, therefore, a blanket enforcement of the grooming regulation is not the least restrictive means of furthering the Defendant's security interests.

Based on the following problems that he alleges would arise from all of the alternatives posed by the Plaintiff, the Defendant asserts that the grooming regulation is the least restrictive means of furthering the compelling security interests relating to inmate identification and the suppression of contraband. *See Phipps v. Parker,* 879 F.Supp. 734, 736 (W.D.Ky.1995) (concluding that requiring inmates to keep their hair short is the only realistic method of achieving the goal of quick identification of inmates). First, regarding the suggestion that inmates with long hair be permitted to conduct searches of their own hair, the Defendant states that this purported less

restrictive means of furthering the interest in suppressing contraband is not feasible because the inmate would likely feign a search in such a way as to keep any contraband secreted. In addition, the Defendant argues that requiring any search of an inmate's hair, whether by the prison staff or by the inmate himself, is problematic because it increases the opportunities for confrontations between inmates and prison staff.

Second, with respect to the suggestion that the prison retain multiple photographs of the prisoner with both long and short hair for identification within the prison, the Defendant states that this, too, would be problematic because it would be difficult to fit more than one picture on inmate identification cards. Additionally, it would be difficult for prison staff members to review more than one picture on an identification card to assure that the inmate before them is the person on the identification card. The Defendant states that the time it would take staff members to review multiple pictures at the various places identification cards are examined would create "bottlenecks" at busy places within the prison.

Third, with respect to the suggestion that multiple photographs of the inmate be released in the event of an escape, the Defendant argues that this suggestion is not feasible for a couple of reasons. First, the release of multiple photographs would take time, which is problematic because, in the event of an escape, time is of the essence.[6] In addition, the Defendant contends that the release of multiple photographs would likely cause more confusion among recipients than help them in determining what the escapee may look like with different hair cuts. As one witness testified, eyewitnesses usually respond bet-

ter after seeing only one picture of a suspect than after seeing multiple pictures of the suspect. Furthermore, the release of multiple photographs could be confusing to the extent that people seeing multiple photographs may mistakenly only look for someone resembling one of those photographs when, in reality, it would be impossible to distribute photographs that could represent all of the ways in which an inmate with long hair might alter his appearance upon escape.

Finally, the Defendant contends that it would not be helpful to grant exemptions to the grooming regulation based on inmates' security classification. He notes that escape attempts and contraband problems arise even in minimum and medium security prisons. Thus, it would not be helpful to assume that minimum or medium security inmates would not pose the security risks attempted to be prevented by these regulations. Moreover, the Defendant maintains that individualized exemptions are problematic because they cause resentment among the other inmates, a copycat effect, and problems with enforcement of the regulations due to staff members' difficulties in determining who is exempted and who is not.

Although the Court must accord due deference to the Defendant's opinion on whether the grooming regulation constitutes the least restrictive means of furthering the government's compelling interests, the Court need not accept at face value those opinions that are clearly illogical in light of the evidence before the Court. For example, although the Defendant argues that searches of inmates' hair performed by the inmates themselves under the careful watch of prison guards is not feasible, this ignores the fact that this is precisely how strip searches are cur-

---

**6.** At the preliminary injunction hearing, a witness for the Defendant explained that the longer time goes on without catching the es-

caped inmate, the less likely it becomes that the inmate will be captured.

rently conducted. In addition, as noted above, prior to 1991, the grooming regulation permitted the warden to make exceptions from the regulation for inmates based on their sincerely held religious beliefs. The Defendant has not presented any evidence indicating that, when that version of the regulation was in effect, the incidence of inmates hiding contraband in their hair increased greatly or that, since the new regulation went into effect, the incidence of inmates hiding contraband in their hair has decreased to a significant extent. This fact undermines the Defendant's assertion that the grooming regulation as written is the least restrictive means of furthering the security interest in suppressing contraband.

Second, although the Defendant states that taking multiple photographs of prisoners would cause significant problems with respect to the identification of inmates within the prison, this assertion is belied by the language of the current grooming regulation which, as indicated above, explicitly requires an additional photograph to be taken any time the inmate's appearance changes significantly. Furthermore, the grooming regulations for female inmates permit them to grow their hair to the middle of their backs. Ohio Admin. Code § 5120–9–251. Although the Defendant argues that female inmates pose less

of a security risk than male inmates in that they are less likely to possess contraband, they are substantially less likely to escape, and they are generally less violent than male inmates, staff members at the women's prisons no doubt have the same need that staff members at the men's prisons have to be able to identify prisoners quickly to prevent "bottlenecks" in lines while distributing medicine and commissary goods and while verifying that the inmates show up at the proper work and housing locations. Yet, allowing the female inmates to grow their hair down to the middle of their backs does not seem to pose a problem in this regard. This undermines the Defendant's argument that allowing the male inmates to grow their hair long for religious reasons would interfere with the efficient identification of inmates within the prison.[7]

Despite these problems with some of the rationales set forth by the Defendant in support of his position that the grooming regulation is the least restrictive means of furthering the compelling government interests, the Court finds that the Defendant is likely to succeed in demonstrating that the grooming regulation is necessary to facilitate the return of an escaped inmate, and that the release of multiple pictures of an inmate with varying lengths of hair would not be a less restric-

7. The Defendant cites a number of cases in support of his position that courts have unanimously rejected the argument that the fact that female inmates are permitted to grow their hair long means that male inmates should be permitted to grow their hair long. *See, e.g., Lentz v. Wilkerson*, No. 94–4314 (6th Cir. Mar. 31, 1995); *Davie v. Wingard*, 958 F.Supp. 1244, 1252–53 (S.D.Ohio 1997); *Pariseau v. Wilkinson*, No. C2–92–1010 (S.D.Ohio Aug. 23, 1995). Those cases discuss the same arguments that the Defendant sets forth here as to why the difference between the male and female grooming regulations should not be considered by this Court. The cases that considered these arguments, however, are

distinguishable because they addressed either Equal Protection claims brought by male prisoners or First Amendment claims brought prior to the promulgation of RLUIPA. Unlike RLUIPA claims, which require a finding that the regulation serves a compelling state interest and is the least restrictive means available for serving that interest, the claims examined by these courts were subject to only intermediate or rational basis scrutiny. Moreover, those cases did not examine the differences between the male and female grooming regulations with respect to the argument that the male grooming regulation is necessary for easy identification of inmates within the prison, as the Court does here.

tive alternative for furthering this governmental interest. Nonetheless, the Court also finds that the Defendant is unlikely to succeed in demonstrating that a blanket application of the grooming regulation, without any sort of exception, is the least restrictive means of furthering the government's interest in the efficient identification of escaped inmates. The Court accepts the position that a blanket restriction on growing a full head of long hair is necessary to further this interest because of the ways in which a full head of long hair can be modified to alter an inmate's appearance, making him more difficult to locate quickly upon an escape. An exception to the grooming regulation, however, that would allow for the growing of a "kouplock" based on sincerely held religious beliefs, and would be granted to inmates who are determined not to pose a significant security risk, is a less restrictive means of furthering the compelling interest in identifying inmates.

The Plaintiff testified that a kouplock is a two-inch square of hair that would grow starting at the base of the skull. Unlike a full head of long hair, a kouplock does not provide an inmate with a full range of options for changing his appearance upon escape. In addition, a kouplock cannot be maneuvered to cover identifiable marks on an inmate's face. Moreover, multiple pictures of an inmate with a kouplock are not necessary as a kouplock cannot be modified or rearranged to alter the appearance of either the inmate's face or his profile. Therefore, the Defendant is unlikely to succeed in demonstrating that an exception to the grooming regulation that would allow inmates who are determined not to pose a significant security risk to grow a kouplock based on sincerely held religious beliefs is not a feasible less restrictive means of furthering the government's interest in identifying inmates.

■ The Court notes that the Plaintiff is likely to succeed in demonstrating that the decision of whether to allow an inmate to grow a kouplock based on sincerely held religious beliefs should be based on an analysis of whether the particular inmate seeking the exemption from the grooming regulation poses a significant security risk, taking into account the inmate's security classification. Just as the Defendant takes into consideration the fact that female inmates, as a whole, pose less of a security risk than male inmates as a justification for allowing female inmates to grow their hair long, so should the Defendant take into account the different security risks of various male inmates in making the decision of whether to allow them to grow a kouplock. In particular, here, the Plaintiff will likely succeed in demonstrating that, as a medium security prisoner who is losing feeling in his feet, he is unlikely to pose a security threat by being permitted to grow a kouplock.

Therefore, the Court finds that the Plaintiff has shown a strong likelihood of success on the merits of his RLUIPA claim to the extent that prohibiting the warden to grant any religious-based exemption to the grooming regulation, including the growing of a kouplock, is not the least restrictive means of furthering the compelling government interests.[8]

8. The Court recognizes that the Defendant asserts that a number of courts have rejected claims that are substantially similar to the claim now brought by the Plaintiff. The only Sixth Circuit case cited by the Defendant in this regard, however, *Pollock v. Marshall*, 845 F.2d 656 (6th Cir.1988), rejected a similar claim under the lower standard of review required by First Amendment claims, not under the strict scrutiny required by RLUIPA. Indeed, *Flagner*, a 2001 case out of the Sixth Circuit, concluded that a plaintiff who, like Hoevenaar, objected to the grooming regulation based on his sincerely held religious beliefs, could pursue injunctive and declaratory relief, even under the lower First Amendment

## 2. Likelihood of Success Under the First Amendment

 Hoevenaar also seeks to enjoin the Defendant's enforcement of the grooming regulation as a violation of his First Amendment rights. To state a claim for violation of his First Amendment rights, a prisoner must demonstrate that the allegedly infringing regulation is not reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In determining whether the Plaintiff has made this showing, four factors guide the Court's analysis: (1) whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether alternative means of exercising the constitutional right remain open to the inmate; (3) the impact accommodation of the constitutional right will have on guards and other inmates, as well as on prison resources generally; and (4) whether an alternative exists that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 88–91, 107 S.Ct. 2254. The four factors need not be weighed evenly, but serve simply as guidelines to evaluate whether the regulation is reasonably related to a valid penological interest. *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir.2001).

### a. Valid, Rational Connection

The Defendant argues that there is a valid, rational connection between the grooming regulation and the legitimate interests in maintaining the ability to identify inmates quickly, both within the prison and in the event of an escape, and in suppressing contraband within the prison. The Court agrees. As discussed above with respect to the Plaintiff's RLUIPA claim, both of these legitimate security interests are furthered by the grooming regulation by reducing the ways in which an inmate can alter his appearance, and by reducing the places in which an inmate can conceal contraband on his person. *See Pollock v. Marshall*, 845 F.2d 656, 659 (6th Cir.1988) (recognizing both the identification of inmates and the suppression of contraband as legitimate penological interests).

The Plaintiff relies on *Flagner* for his position that no valid, rational connection exists between the regulation and the Defendant's legitimate security interests. In *Flagner*, when an Orthodox Jewish prisoner sought an exemption to the prison grooming regulation to grow a full beard and sidelocks in accordance with his religious beliefs, the Sixth Circuit considered both of the foregoing rationales, which had been proffered by the defendants in that case as a basis for denying the exemption. The *Flagner* court rejected the defendants' argument that the grooming regulation bore a valid and rational connection to those legitimate interests because, there, the defendants had failed to present any evidence that the inmate seeking the injunction was either an escape risk or that he had ever been caught with contraband during a search of his beard or sidelocks. *Flagner*, 241 F.3d at 485–86.

This case is distinguishable from *Flagner* with respect to these issues. Unlike the plaintiff in that case, Hoevenaar has a history that includes three escape attempts.[9] Two of these escape attempts

---

rational basis standard of review. Moreover, none of the cases cited by the Defendant as having rejected similar claims under the RFRA or RLUIPA strict scrutiny standard discussed the less restrictive option of allowing a Native American who does not pose a significant security risk to grow a kouplock.

**9.** The Plaintiff argues that at least two of these incidents should not be classified as "escape attempts" because they did not involve actual, physical attempts by Hoevenaar to escape. The labeling of these two incidents as "escape attempts," however, is logical based on the contraband that Hoevenaar was

took place within the last decade, including in the year 2000. Also unlike the plaintiff in *Flagner*, Hoevenaar also has a history of being involved with contraband. He has pled guilty to or has been found guilty of violating Ohio Admin. Code § 5120–9–06(8), which prohibits the possession of contraband, eight times while in custody in the Ohio prison system. Two of these contraband violations occurred during the last year. Thus, the grooming regulation is rationally related to the Defendant's legitimate security interests not only as a general matter, but also as specifically applied to the Plaintiff.

b. *Alternative Means of Exercising Constitutional Right, Impact of Accommodation, Available Alternative for Accommodating Prisoner's Rights*

The last three *Turner* factors are to be balanced and evaluated together. *Flagner*, 241 F.3d at 484. With respect to the question of whether alternative means of exercising his religion remain open to the Plaintiff, *Flagner* indicates that this factor weighs in favor of Hoevenaar. In *Flagner*, the Sixth Circuit determined that enforcement of the grooming regulation would leave the plaintiff with no viable alternative for exercising the particular tenet of his religion that required him to grow a beard and sidelocks. *Id.* at 486 (noting that the ability to exercise other aspects of his religion would not make up for violating this particular aspect of his religion). Similarly, here, the only alternative available to Hoevenaar for practicing this particular fundamental aspect of his religion is to grow a kouplock. Even this alternative, however, would require an accommodation with respect to the grooming requirements.

Similarly, *Flagner* also indicates that the third factor weighs in favor of the Plaintiff. The *Flagner* court found that the third factor weighed in favor of the plaintiff because no prison resources were ever diverted to accommodate the plaintiff's exemption from the grooming regulation, no extra guards were ever hired, nor were regular guards paid overtime, to respond to the additional security risks allegedly created by the plaintiff's exemption to the grooming regulation, and no evidence indicated that other inmates resented the plaintiff because of his exemption. *Flagner*, 241 F.3d at 486. Likewise, here, although the Defendant surmises that exempting inmates from the grooming regulation could cause resentment among non-exempted inmates, he has offered no proof that inmates resented those who were granted religious exemptions under the prior version of the grooming regulation, which permitted the warden to grant exemptions based on religious beliefs. In addition, although the Defendant argues that an exemption would require prison staff to search manually through an exempted inmates' hair, thereby putting the prison staff at risk from the sharp objects that may be hidden in the hair, in fact, as was done in *Flagner*, the inmate might search his own hair under the watch of a prison guard. Indeed, during the preliminary injunction hearing, the Defendant testified that this is how hair searches were conducted under the prior version of the grooming regulation. Moreover, this self search can be done quickly and effectively. Finally, although the Defendant contends that exemptions from the grooming regulation could make it more difficult for prison staff to determine who is sub-

---

found to possess at the time of those "attempts." For example, one of these incidents is classified as an "escape attempt" based on Hoevenaar's possession of local maps and a sharp can opener, which could have been used as a weapon. Similarly, another one of the "attempts" related to Hoevenaar's possession of security phone numbers and an officer's uniform with his name on it.

ject to the regulation, as the Plaintiff has pointed out, this problem is eliminated by the fact that any inmate with an exemption would carry a "blue card" with him at all times, as Hoevenaar does for his other religious accommodations. Staff members would easily be able to determine that any inmate without a blue card would be subject to the regulation.

The fourth *Turner* factor likewise weighs in favor of the Plaintiff in light of the fact that he can be accommodated by being permitted to grow a kouplock, which would impose a *de minimis* burden on the prison, requiring only that Hoevenaar be permitted to conduct a periodic search of his own hair under the careful watch of prison guards. Most likely, as discussed above, a kouplock would not even require multiple photographs to be taken, as a kouplock is unlikely to significantly alter an inmate's appearance.

■■■ On balance, the second, third, and fourth factors of the *Turner* analysis weigh in favor of the Plaintiff. Hoevenaar's prior history of escape attempts and citations for possession of contraband, however, weigh heavily in favor of the Defendant. Indeed, in light of Hoevenaar's extensive history, and in light of the low level of scrutiny to be imposed in First Amendment claims such as this, the Court believes that the Defendant would likely be able to demonstrate that the first of the four *Turner* factors outweighs the considerations set forth in the remaining three factors.

Therefore, the Court finds that, although it is likely that the Plaintiff will succeed on his RLUIPA claim, the Plaintiff has not demonstrated a substantial likelihood of success on his First Amendment claim.

### B. Irreparable Injury

■■■ The Court finds that the denial of an injunction under these circumstances would cause the Plaintiff to suffer irreparable harm. As Hoevenaar testified at the preliminary injunction hearing, and as discussed above, long hair is his "spiritual essence"; it allows him to absorb positive energy during religious ceremonies, it facilitates his connection to his ancestors, and it brings him closer to the "Red Road of Life," or the path to goodness and spirituality. It is clear that long hair is essential to Hoevenaar's sincerely held religious beliefs and his exercise thereof. Accordingly, denial of the requested injunction, which would result in the cutting of all of his hair, would result in irreparable harm. *Goodman v. Money,* 180 F.Supp.2d 946, 947 (N.D.Ohio 2001) (finding that the cutting of an inmate's hair in violation of his sincerely held religious beliefs constitutes irreparable harm); *Estep v. Dent,* 914 F.Supp. 1462, 1467 (W.D.Ky.1996) (stating that every time prison officials cut the plaintiff's earlocks, they were potentially violating his First Amendment rights, and thereby committing irreparable harm).

The fact that the Plaintiff may be able engage in other facets of his religious practice does not undercut the conclusion that the denial of the injunction would result in irreparable harm. This Court would not tell an Orthodox Jewish prisoner that he need not be permitted to grow sidelocks because he already receives dietary accommodations so that he may adhere to Judaism's dietary laws. Both practices are essential to his religious exercise, and the presence of one does not negate the necessity of the other. *See Flagner,* 241 F.3d at 486 ("None of the other aspects of [the plaintiff's] religion could ever compensate for the fact that an essential tenet of his religious beliefs prevents him from cutting his beard or sidelocks, and that enforcement of the grooming regulation would require the plaintiff to violate this very tenet."). So here, the fact that Hoevenaar may engage in smudging ceremonies and other religious prac-

tices does not negate the necessity of having long hair when he does so.

Therefore, the Court finds that the denial of the injunction would cause the Plaintiff irreparable harm.

### C. Substantial Harm to Others

██ The Court does not believe that granting the injunction requested by the Plaintiff would result in substantial harm to others. The Defendant argues that granting the injunction would, in fact, cause harm in multiple ways. First, he contends that granting the injunction would cause other inmates without an exemption to be resentful of the Plaintiff. The Defendant has presented no evidence, however, that when inmates were granted religious exemptions under the prior grooming regulation, such resentment actually resulted among the inmates at Madison, nor has the Defendant demonstrated that resentment or tension among inmates decreased when the grooming regulation was altered so that exemptions could not be given to inmates on the basis of sincerely held religious beliefs.

Second, the Defendant states that the prison staff would be burdened by the granting of an injunction because they would be forced to search the Plaintiff's hair as it might grow in a kouplock. For the reasons discussed above, however, the Court finds that this issue does not impose a significant burden on prison staff.

### D. Public Interest

██ The public interest is served when an individual is able to enjoy the rights that he is explicitly granted pursuant to federal law. Accordingly, granting the injunction sought by the Plaintiff here is in the public interest. The Defendant argues that it would be in the public interest to deny the injunction because, for the reasons discussed above, it might take longer to capture an escaped inmate who was allowed to grow his hair long. The Court has determined, however, that the less re-

strictive means of furthering the government interest in identifying inmates is not to allow all inmates to grow their hair long, but to allow inmates who are determined not to pose significant security risks to grow kouplocks as required by their sincerely held religious beliefs. As discussed above, a kouplock cannot be manipulated to alter the appearance of an inmate's face or his profile. Therefore, the granting of the injunction is not likely to result in the delayed capture of an inmate in the event of an escape.

Therefore, the Court finds that it would be in the public interest to grant the Plaintiff's injunction.

## IV. CONCLUSION

In light of the foregoing analysis, the Court finds that all four factors to be considered upon a motion for a preliminary injunction weigh in favor of the Plaintiff with respect to his RLUIPA claim. Therefore, the Court **GRANTS** the Plaintiff's Motion for a Preliminary Injunction. The Defendant is hereby **ENJOINED** from preventing the Plaintiff from growing a kouplock, as described by the Plaintiff during the hearing on this matter, pending the outcome of the final litigation of this matter.

**IT IS SO ORDERED.**