KAREN NELSON MOORE, Circuit Judge,
dissenting in part, concurring in part.
I respectfully dissent from Parts II.A and II.B of the majority’s opinion. The tragic destruction at Columbine High School in Littleton, Colorado etched devastating images of adolescent rage run amok onto the national consciousness. The realization that the perpetrators of this violence were young teenagers crystallized latent fears that a new danger had emerged from within our own communities. In the weeks of national introspection that followed, parents, students, and educators alike expressed anxiety that copycat incidents were imminent and stood vigilant against their occurrence. While I do not discount the reality that such an environment left these school and law enforcement officials with little choice but to make unenviable judgments under enormous pressure,[1] I cannot conclude that post-Columbine trepidation over copycat crimes systematically discounts real factual disputes over the violations of these studentá’ constitutional rights.[2] Rhys and Zach have presented several genuine issues of material fact concerning the circumstances of their arrests and suspensions, which would permit a reasonable jury to find in their favor. At this stage of the litigation, we are charged only with the task of assessing whether such a quantum of evidence has been proffered and not with the responsibility to 'balance such evidence against facts to the contrary. As a result, I would hold that the grant of summary judgment was improper with respect to Rhys’s and Zach’s § 1983 Fourth Amendment claims against Jeffrey Hayes (“Hayes”) and Jean Stevens (“Stevens”) and their § 1983 Fourteenth Amendment claims against William Howell (“Howell”) and Thomas Lodge (“Lodge”).[3]
*644 I. BACKGROUND FACTS
I explicate my understanding of the facts because part of my disagreement with the majority stems from our somewhat divergent interpretations of the record, particularly the facts surrounding Zach’s arrest. After the phone call on Wednesday, April 21, 1999, during which Zach allegedly told Kayla Hollins about his plan to kill the “preps” and implicated Rhys in the process, Kayla made no mention of the phone call to her parents, to her friends, or to school authorities for nearly two days. Kayla first discussed the alleged contents of the phone call in a note written to Sadie Le Page on Friday, April 23, 1999. A few hours and several class periods later, the girls approached Zach and asked him whether the note’s contents were true, allegedly receiving an affirmative answer. Zach disputes that he confirmed the note’s veracity, and before he had a chance to read the note, Kayla ripped the note in two, allegedly because she did not want Zach to read the note and because she did not want him to get in trouble. In her testimony at Zach’s trial, she intimated that the note and the following drama were jokes, and that she did not expect or want Zach to get arrested. Other facts bolster the conclusion that Kayla may have fabricated or embellished her conversation with Zach; Kayla was reported to exaggerate at times and had caused trouble for others in the past by prevaricating. It was only after the lunch period that Sadie and Katie finally decided to inform school officials of the threat, approaching the school’s guidance counselor, Julie Orsini, who in turn contacted Vice Principal William Howell.
Howell then took the lead role in “investigating” the incident. He met with Sadie and Katie before eventually calling Kayla *645 to his office. All three girls wrote statements in which they described the events of that morning and their interactions with Zach. Howell did not investigate the veracity of their claims; he instead assumed that the girls were telling the truth. He never saw the note that Kayla had written. At some point after he spoke with the girls, Howell began the process of “emergency removing” Zach from the school, Howell contacted Assistant Superintendent James Spisak (“Spisak”), who agreed that Zach needed to be transferred out of the school because of a “continuing danger” that Zach posed. See Ohio Rev.Code § 3813.66(C).
After failing to reach Zach’s mother, Howell called Hayes, Zach’s probation officer, so that Howell could release Zach to an adult. Hayes and Howell spoke twice before Hayes arrived at the school, and during the second phone call, Howell informed Hayes of the girls’ claims that Zach had threatened them with violence. Either before going to the school or while in transit, Hayes spoke with Stevens, his supervisor and the Chief Probation Officer of Guernsey County, and erroneously informed her that two of their juvenile probation “clients” were implicated in a bomb threat. Hayes mentioned that the Cambridge police had begun an investigation, but Hayes did not name any officers, and he later testified that he did not see any police officers when he arrived at the school.
Upon arrival, Hayes met with Howell, who informed Hayes about the statements of the three girls. Hayes asked Howell “whether these [girls] were reputable students,” because he wanted to determine “whether it was somebody trying to get even with Zach or that type of thing.” Hayes Dep. at 21.[4] However, Hayes never spoke with girls; he did not assess the girls’ credibility himself, nor did he conduct an in-depth investigation. Hayes testified that his decision to seize Zach was based on the girls’ written statements, Howell’s understanding of the contents of Kayla’s torn note, Howell’s intuitions about Zach, and Hayes’s belief, shaped primarily by Howell, that the girls were reputable sources. However, Hayes did not learn that Kayla had a reputation, even among her friends, for embellishment of the truth, nor did he learn that Kalya had disciplinary problems in the past.
The details of Zach’s arrest are critical. There are several non-trivial disputes concerning the few minutes preceding Zach’s arrest, the significance of which plays no small role in my decision to dissent. Howell called Zach into his office and questioned him about the girls’ accusations. Howell stated: “When questioning Zach in the office, he had indicated that he was joking around and the statement was, You know how Rhys is.” Joint Appendix (“J.A.”) at 581 (Howell Dep.). Howell also testified that Zach confirmed the contents of the note, although Howell gave contradictory testimony about whether he ever saw the note or showed it to Zach. Compare J.A. at 594 (Howell Dep.) with J.A. at 296 (Zach Durbin Trial, Howell Test.) (“[T]hey [the girls] stated that Zach had written a note but I never was able to resurface the note.”).
For his part, Zach disclaimed that he had made any threats. Zach stated in his deposition that Rhys had been “joking around” with his mother, Gail Allen, when Rhys and Zach were discussing the Columbine incident with Allen several hours before Zach and Kayla’s telephone call. J.A. at 469-70. The “joking around” consisted *646 of Rhys asking his mother what she would do if he and Zach perpetrated an act like the tragedy that befell Columbine, but it did not include any indication that Zach or Rhys intended to harm anyone. Zach stated that he did not “joke around” with Rhys’s mother. The majority believes that Zach informed Howell about Rhys’s “joking around.” However, Zach’s deposition does not indicate that he told Howell that either he or Rhys had been joking around with Rhys’s mother. His deposition testimony about his discussion with Howell is as follows:
Q: Tell me what happened when you got to the office.
A: We went in Mr. Howell’s office, and he closed the door, and Mr. Howell told me that there had been a note circulating and three girls came to the office with the note and told him that I was— me and Rhys said we was going to blow up the school.
Q: Do you know what he was talking about when he said that?
A: I knew what he was talking about after he said a note was circulating.
Q: You knew what three girls he was talking about?
A: Yeah.
Q: What did you say to that?
A: He just kept going on with the story and then — I was like, no, that’s not true. And then he just kept going on and then he asked me, he said, do you have anything to say, and then I started telling him what really happened about me being at Rhys’s house and then my conversation with Kayla, and then that’s when Jeff [Hayes] was like, “I’ve heard enough. Set down your books.”
J.A. at 473-74 (Durbin Dep.) (emphasis added). Zach stated clearly in his deposition that he never told Howell that he had joked with Kayla about “doing something like the kids did at Columbine.” J.A. at 474.
During a second phone call with Stevens before Hayes entered Howell’s office, Hayes reported that he had taken statements from three girls whom he found to be reputable, prompting Stevens to approve Zach’s “arrest.” At some point, Hayes went into Howell’s office, but it is not clear at what point during Howell’s questioning of Zach this occurred. It is also uncertain whether Hayes, as the actual arresting officer, actually heard Zach admit that he had made the threats, if Zach ever said such a thing. Hayes did not corroborate Howell’s assertion that Zach admitted to making the threats. Furthermore, Hayes never asked Zach to recount his view of the day’s events. Hayes later stated: “I’m not the one that’s going to be investigating. I didn’t want him to say anything to me. I never want the kid to. say anything to me that, you know, I might have to testify against him or something like that. He did profess his innocence to me.” Hayes Dep. at 35-36. After some undefined but brief period of time, during which Zach tried to exculpate himself, Hayes told Zach to set down his books, and then Hayes arrested Zach.
Rhys was not involved with any aspect of the investigation that took place at the school on Friday, April 23, as he was absent from school. Neither Hayes nor Stevens observed Rhys or spoke with the girls about Rhys. Rhys’s name became entwined in these events only because of Kayla’s note, as neither Howell nor Zach recalled that Rhys’s name came up in the conversation in Howell’s office.
II. RHYS’S AND ZACH’S § 1983 CLAIMS
Rhys and Zach assert two separate § 1983 claims based upon alleged violations of their Fourth and Fourteenth *647 Amendment rights. I believe that the genuine issues of material fact attendant to both claims require the reversal of the district court’s grant of summary judgment.
A. The Fourth Amendment Claims
Recognizing that all evidence and inferences from that evidence must be taken in a light most favorable to Rhys and Zach, I believe that it is patently clear that there is a genuine issue of material fact concerning whether or not Hayes and Stevens had probable cause to arrest them.[5] Probable cause means the “facts and circumstances within the officer’s knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.” Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir.1988) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). “The Fourth Amendment ... necessitates an inquiry into probabilities, not certainty.” United States v. Strickland, 144 F.3d 412, 415 (6th Cir.1998). In analyzing an officer’s actions, we must look at the totality of the circumstances from a reasonable officer’s perspective at the time of the arrest so as to avoid the effect of hindsight bias. Klein v. Long, 275 F.3d 544, 550 (6th Cir.2001). The arresting officer does not need to demonstrate that prima facie proof exists before arresting a suspect, but the officer’s underlying motivation for the arrest must be based on something more than mere suspicion. See United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990).
Even though an officer does not have to search for balancing evidence after establishing that probable cause existed, an officer must consider all evidence, including exculpatory evidence, before making a probable cause determination. Officers cannot make “hasty, unsubstantiated arrests with impunity.” Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir.1999). Nor can they “simply turn a blind eye towards potentially exculpatory evidence known to them.” Id. at 372. Furthermore, there can be no probable cause for an arrest when it is based upon an officer’s reliance on vague information from a source of untested reliability. Wong Sun v. United States, 371 U.S. 471, 482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In general, the question of probable cause is one for the jury, unless it is clear that only one reasonable determination is possible. Crockett v. Cumberland College, 316 F.3d 571, 581 (6th Cir.2003).
1. Rhys’s § 1983 Fourth Amendment Claim Against Stevens
Considering all available evidence and inferences from that evidence in the light most favorable to Rhys, a reasonable jury could conclude that the facts and circumstances of which Stevens was aware did not justify Rhys’s arrest because Stevens relied blindly upon Hayes’s recommendations, without confirming that Hayes had tested the allegations of the three stu *648 dents, investigated the incident beyond accepting Howell’s version of the events, or even spoken with Rhys. Compare Criss, 867 F.2d at 262; Ahlers, 188 F.3d at 372. When Hayes called Stevens, Rhys was not at school, and Hayes’s knowledge of Rhys’s potential involvement came only third hand (Hayes spoke with Howell about Kayla’s note, which recounted the alleged conversation with Zach from the night before, during which Rhys’s name was briefly mentioned). Hayes did nothing further to investigate Rhys’s involvement, nor did Stevens order him to do so. Hayes did not speak to the girls, nor did he confirm Rhys’s involvement in the threat. While the girls did believe that Zach had personally indicated the veracity of his threat, no comparable evidence existed as to Rhys. The only evidence linking Rhys to the threat was Kayla’s note, which Hayes never saw, and Kayla’s statements, which Hayes never took. Both of these were tangential pieces of evidence, as Kayla never actually spoke with Rhys, a fact that Hayes never uncovered.
One could conclude that it was impossible for Stevens to believe that probable cause existed based upon the extremely limited evidence gathered by Hayes, who had neglected to speak with or observe the accused, to test the allegations of the principal witnesses, or to investigate Rhys’s involvement more than superficially. Hayes relied on hearsay information about a student who was not even in attendance in school and whose name became intertwined in this web of events only because of Kayla’s note. Hayes then relayed this data to Stevens. From that limited information, Stevens authorized a detention. As the Supreme Court has said, there can be no probable cause for an arrest where it is based upon an officer’s reliance on vague information from a source of untested reliability. Wong Sun, 371 U.S. at 482, 83 S.Ct. 407. Consequently, I believe that there is a genuine issue of material fact concerning whether Stevens had probable cause to order the arrest of Rhys.
2. Zach’s § 1983/Fourth Amendment Claim Against Hayes and Stevens
The circumstances surrounding Zach’s arrest undoubtedly present a closer call, but ultimately I believe that the district court’s grant of summary judgment was in error.[6] Much of the same rationale that supports my reasoning regarding Rhys’s claim against Stevens applies here. Hayes arrived at the school mistakenly believing that the school was handling an impending bomb threat, a misunderstanding that he conveyed to Stevens. Relying solely on Howell’s own limited investigation and Howell’s belief that the girls were “reputable and believable,” Hayes performed no additional investigation, foregoing an opportunity to assess for himself the girls’ credibility and to discover that at least one of the girls had a reputation for exaggeration.
A sharp difference between Zaeh’s and Rhys’s arrests is that Hayes did actually speak with Zach. Hayes had an opportunity to assess Zach’s behavior and his credibility, but Hayes declined to hear Zach’s recounting of events, mainly out of a belief that this would protect Zach. This deprived Hayes of the ability to make a grounded determination that he had probable cause to arrest Zach. I do not endorse a wholesale rule that law enforcement officials investigating a crime or a threat of a crime must always speak with the alleged perpetrator before determining that prob *649 able cause exists, particularly when sufficient inculpatory evidence is apparent to the arresting officer. See Klein v. Long, 275 F.3d 544, 551 (6th Cir.2001) (holding that officers had probable cause to arrest without questioning the suspect when officers responded to a domestic violence 911 call and immediately saw a visibly upset and bleeding woman who told the officers that her husband had physically harmed her). Nonetheless, when sufficient incul-patory evidence is not immediately obvious, an arresting officer has done little to investigate the threats allegedly made by the accused, and the officer has not spoken with the principal accusers, the determination of probable cause is undermined.
"While Howell testified that Zach admitted making threats against Kayla, but that Zach was only “joking around” in making such intimidations, Zach denies ever having made such threats. The existence of this factual dispute highlights two problems with the majority’s holding. First, Zach disputes that he ever admitted threatening Kayla. Zach told Howell that in his conversation with Kayla he merely recounted the details of an innocuous conversation with Rhys’s mother. In his deposition, Zach declared that he did not confirm the veracity of the ripped note’s contents to Howell. It is not for this court to decide whether Zach or Howell is more believable; rather, we must assume that Zach’s story is true for the purposes of reviewing the district court’s grant of summary judgment. Second, even if Zach did make such an admission, there is no evidence that Hayes heard it, and thus it could not have informed his probable cause determination. As 'the arresting officer, it is Hayes’s probable cause calculus, and not Howell’s, with which we should be concerned. The majority appears to focus on Howell’s determination of the trustworthiness of the three girls, but it is Hayes’s probable cause determination, not Howell’s, that is the focus of this case. Neither Howell nor Hayes suggest that Zach admitted to having made the threats in Hayes’s presence or that Howell told Hayes about the supposed “confession” before Hayes decided to arrest Zach.
There is no doubt that Hayes was faced with a difficult and delicate choice. He arrived at the school and was told by Vice Principal Howell that Zach, who had a history of prior, albeit nonviolent, juvenile delinquency, had threatened several students two days after the Columbine disaster. However, Hayes, as a probation officer, had little experience in investigating crimes or potential crimes. See Hayes Dep. at 25 (“We don’t normally investigate things. We are asked to act on an emergency basis.... That’s why I wanted to see what these statements said, to see if it was, you know, possibly believable, and then we would call on law enforcement to investigate it .... ”); see also United States v. Guzman, 75 F.3d 1090, 1096 (6th Cir.), cert. denied, 519 U.S. 906, 117 S.Ct. 266, 136 L.Ed.2d 190 (1996) (“Law enforcement officers naturally reach conclusions based on their training and experience.”). He did not ask Howell to describe in more depth the chain of events that led to Zach’s emergency removal. He did not inquire of Howell about the bases for Howell’s determination that the girls were telling the truth. He did not interview any of the students involved, either the girls or Zach, to make his own assessment of their reliability. He did not investigate whether Zach even had access to weapons that would allow him to carry through the alleged threat. Hayes did not make another attempt to contact Zach’s parents or to keep Zach at the school until his parents could be reached, despite the fact that there was no suggestion that Zach would have engaged in any violence waiting for his parents at the school. This was not a *650 situation in which Howell or another member of his staff observed Zach make a threat or commit any act of violence or in which multiple warning signs about Zach’s behavior and history made his alleged threat more likely. By analogy, it would surprise the reasonable person if the police could have probable cause to arrest him or her based solely upon hearsay, where no observable evidence supported an allegation of wrongdoing and the police failed to question either the accuser or the accused, but instead relied on the statement of a third party to whom the accuser recounted the hearsay.
Our decision in Williams v. Ellington, 936 F.2d 881 (6th Cir.1991), provides some contrast about the level of investigation that must take place before school officials can act, although the legal question in Williams concerned probable cause to search as opposed to probable cause to arrest. See New Jersey v. T.L.O., 469 U.S. 325, 341-42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (establishing that a student search “does not require strict adherence to the requirement that searches be based on probable cause” and stating that a search will satisfy a “reasonableness” requirement “when there are reasonable grounds for suspecting that the search will turn up evidence” of an illegality). In Williams, the plaintiff, a teenage girl, claimed that her high school violated her Fourth Amendment rights by strip searching her without probable cause as part of an investigation into allegations that she had been consuming drugs at the school. Id. at 882. A fellow student first alerted the principal to the problem by claiming that she had witnessed the plaintiff and a friend ingesting drugs in class. The principal verified that the accusing student had no animosity towards the plaintiff, ruling out any ulteri- or motives of the accuser, and then launched a multi-day investigation of the plaintiff. He approached several of the plaintiffs teachers, who corroborated her strange behavior and reported a note that the plaintiff wrote in which she referred to drug use. The principal also collected information from the school’s guidance counselor, the plaintiffs aunt, and the friend’s father, all of whom expressed concern that both students may have been taking drugs. The principal acted only when the student who first made the allegation again approached him and complained for the second time that the plaintiff was ingesting drugs in class. Id. at 883.
We held that reasonable suspicion — the standard set forth in New Jersey v. T.L.O. — did exist for the strip search in Williams. Based upon T.L.O.’s analogy to the reasonable — suspicion standard set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we wrote, “We can correlate the allegations of a student, implicating a fellow student in unlawful activity, to the case of an informant’s tip,” which by itself meets the threshold for reasonable suspicion. Williams, 936 F.2d at 888. Yet, when “there is concern that students will be motivated by malice and falsely implicate other students in wrongdoing, that type of situation would be analogous to [an] anonymous tip,” which does not establish reasonable suspicion in the absence of further investigation. Id. at 888-89. We upheld the lower court’s dismissal of the plaintiffs suit in Williams because in addition to the complaining student’s “tip,” which the principal determined was not borne of malice, the principal uncovered strong evidence during his ensuing investigation, including the suspicions of the plaintiffs family that she was using drugs.
Juxtaposing the events in Williams with the facts of this case demonstrates the insufficiency of the investigation of Zach’s threat. Both Howell and Hayes satisfied themselves that neither Kayla nor the oth *651 er girls leveled these accusations against Zach out of malice; accordingly, Kayla’s allegations may be best analogized to an informant’s tip. While these allegations may have created a reasonable suspicion for Howell or Hayes to search Zach for weapons, without further investigation, they did not present “facts and circumstances ... sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.” Criss, 867 F.2d at 262. Unlike the principal in Williams, Hayes did not engage in any further investigation of Zach or his threats. Hayes did not necessarily need to spend days investigating the incident before concluding that he had probable cause, but Hayes could have conducted at least some minimal level of investigation in a short period of time that afternoon. Taking into account the totality of all the facts and circumstances of which Hayes was aware, there are enough factual disputes to permit a reasonable jury to conclude that Hayes, and Stevens through her supervisory role, violated Zach’s Fourth Amendment rights by arresting him without probable cause.[7]
B. Fourteenth Amendment Claims
The majority also errs in its determination that summary judgment was proper as to the § 1983 Fourteenth Amendment claims. The Fourteenth Amendment’s guarantee of procedural due process requires that, for a suspension of no more than ten days, a school administration give a student notice of the charge(s) against him, an explanation of the evidence underlying those charges, and an opportunity to attend a hearing during which the student can present a defense. Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); see also Seal v. Morgan, 229 F.3d 567, 574 (6th Cir.2000) (citing Goss for principle that students cannot be suspended without an opportunity for a hearing). In general, the hearing, which can be informal, should occur before the student is removed from the school, although this is not necessary for a procedure to pass constitutional muster. Buchanan v. City of Bolivar, 99 F.3d 1352, 1359 (6th Cir.1996).[8] *652 The parties chiefly disagree over whether either student actually was suspended and not whether either student received adequate notice. The defendants do not contest the lack of notice because they argue that the parents of Rhys and Zach voluntarily kept them from school during the ten days they were allegedly suspended. Because I would hold that a genuine dispute of material fact exists regarding whether or not the school actually suspended the two students, I would reverse the district court.
1. Rhys
Taking the evidence in a light most favorable to Rhys, summary judgment should not have been granted. The majority points to some pieces of evidence that cut against Rhys’s claim. Rhys never received any paperwork regarding a suspension, a fact that Howell and Lodge latch onto as proof that no suspension ever existed. Additionally, Rhys’s mother stated that part of the reason for Rhys’s absence was her reluctance to expose him to any backlash from his peers. However, when one views the evidence in a light most favorable to Rhys, as we must, genuine disputes of material fact become evident. The absence of any paperwork regarding Rhys’s suspension does not conclusively suggest that no suspension existed, particularly given Howell’s inconsistent testimony regarding both the existence of suspension paperwork and his intent to suspend the two students. Furthermore, Rhys’s mother did not keep Rhys out of school solely because she alone feared a backlash against Rhys; the principal, Mrs. Smith, advised her to keep Rhys out of school. It seems doubtful that the principal of the school would advocate a student missing ten days of school or even tolerate a student missing such a long period of time in the absence of some formal or informal suspension.
2. Zach
Zach presents even more evidence of a genuine factual dispute regarding the existence of a suspension. Bobbi LaCross, his mother, never received official notice of the suspension, yet on April 26, Howell made Zach sign a paper regarding the suspension and told LaCross “that Zach was going to be suspended; but if he was found not guilty, then the suspension would be canceled.” J.A. at 617 (LaCross Dep.). LaCross asked Howell about appealing the suspension, and he responded that he would mail her the papers. After failing to receive the papers, LaCross called Lodge several times to complain; her conversations with him suggested that *653 Lodge had seen the suspension papers and was frustrated that LaCross had not obtained them yet. Upon finally receiving the papers, long after the suspension period had ended, LaCross tried to appeal, only to be told that there was nothing to appeal because no suspension had ever issued. This sequence of events creates a factual dispute about whether the school officials either suspended Rhys and Zach without notice or constructively suspended them, by telling their parents that they were suspended, but not moving through the formal suspension process.
The majority also reasons that summary judgment was proper because even assuming that a suspension existed, the school satisfied the Goss due process requirements by giving Zach proper notice, an explanation of the evidence supporting the charge, and an opportunity for Zach to respond. Op. at 641-42. The majority reaches this conclusion based upon the brief conversation Zach and Howell had in Howell’s office shortly before Zach was arrested. I cannot concur for two reasons. First, whatever the limited notice and opportunity for objection given to Zach, it occurred in the context of Zach’s emergency removal, not his alleged suspension. Howell questioned Zach to determine whether Zach should be emergency removed from the school. Emergency removal is different than suspension; the former involves an immediate, limited duration expulsion from school, whereas the latter results in a longer absence from school. See J.A. at 348 (Cambridge Bd. of Educ. Procedures). While Howell may have given Zach the required process with regard to the emergency removal, the emergency removal reached its end point before Zach learned of his ten-day suspension. Assuming, as we must, that Howell actually suspended Zach conditioned upon the result of Zach’s trial, Howell afforded Zach no opportunity to review the evidence or respond to the charges that prompted the ten-day suspension. The purposes of Goss would be defeated if a school were permitted to institute multiple suspension proceedings against a student, even if based upon the same incident, but only allowed the student to defend him or herself once.
Second, there is a factual dispute over how much of an opportunity Zach had to respond to the charges and evidence brought against him in the emergency removal “proceeding.” While Howell suggests that Zach had a chance to respond and admitted to making threats, Zach presents a completely different recollection of the events of that afternoon. Zach stated in his deposition that he denied ever making the threats to Kayla. The majority again assumes, as it does throughout its analysis, that Howell’s testimony about Zach’s “confession” is an accurate description of what actually occurred, but this presumption turns the summary judgment standard on its head; we must assume, for purposes of summary judgment, that Zach’s story, not Howell’s, is the correct one. Zach claimed that Howell did not give him much of an opportunity to defend himself, because Hayes arrested Zach before he could fully explain. While an “informal give-and-take between students and disciplinarian,” Goss, 419 U.S. at 584, 95 S.Ct. 729,- may constitute enough process to satisfy Goss, the parties dispute precisely how much informal conversation occurred between Zach and Howell. It is the place of the jury, and not this court, to reconcile these conflicting testimonies regarding whether Zach had enough of an opportunity to defend himself to satisfy Goss. Consequently, I do not agree that the district court should have granted summary judgment to the defendants.
III. CONCLUSION
The issue presented to this court is not whether Rhys and Zach should ultimately *654 prevail on the merits in their action against the defendants. The issue is whether, taking all the evidence in the record and the inferences from that evidence in the light most favorable to Rhys and Zach, genuine disputes of material fact exist that would permit a reasonable jury to find in them favor. Whereas the majority assumes facts to be true that are actually disputed, I believe that genuine issues of material fact surround Rhys’s Fourth Amendment claim against Stevens, Zach’s Fourth Amendment claims against both Hayes and Stevens, and both students’ Fourteenth Amendment claims against Howell and Lodge. The district court thus erred in granting the defendants’ motion for summary judgment. The school, police, and probation officials faced excruciatingly difficult decisions amidst the fear-drenched penumbra of Columbine, but in the presence of genuine issues of material fact, it is the task of the fact-finder to evaluate the significance of these contextual factors to the determination of probable cause and the decision to suspend the students. For these reasons, I respectfully dissent.

. In fact, the Columbine school district, the Jefferson County Sheriff's Department, and the parents of the two Columbine killers have all been sued for their failure to act upon real and credible threats. See Castaldo v. Stone, 192 F.Supp.2d 1124 (D.Colo.2001). The existence of such cases should not, however, deprive students of legal redress for constitutional infractions by schools, police, and other local officials.

. At least one other federal court vindicated the efforts of police officers following a threat in the wake of the Columbine tragedy in a case that is distinguishable on the facts and obviously not binding on this panel. See Cohen v. Dubuc, No. 3:99-CV-2566 (EBB), 2000 WL 1838351, at *4-6 (D.Conn. Nov.28, 2000) (the arresting officers themselves interviewed the witnesses, revealing an actual date of attack, and the threats were more coherent and violent).

.I concur with the majority’s holding to the extent that it affirms the district court's grant of summary judgment as to several other claims asserted by Rhys and Zach. First, neither plaintiff appealed the grant of summary *644 judgment with regards to the following claims: intentional infliction of emotional distress, defamation, violation of First Amendment rights in contravention of § 1983, conspiracy to violate § 1983, and the existence and enforcement of school and city policies that proximately caused the violation of constitutional rights. Notably, neither plaintiff argued on appeal that an officially executed or tolerated custom or policy directly led to and was proximately linked with unconstitutional behavior. See Garner v. Memphis Police Dep’t, 8 F.3d 358, 364 (6th Cir.1993), cert. denied, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Thus, the plaintiffs are not appealing the central claims against the institutional defendants. Litigants waive any claims or defenses that they do not raise in their appellate briefs. Bickel v. Korean Air Lines Co., 96 F.3d 151, 153 (6th Cir.1996).
Second, Rhys’s and Zach's § 1983 Fourth Amendment claims against the school official and police department defendants fail as a matter of law because those defendants never "arrested” Rhys or Zach. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). No police officers were present at the school when Zach was arrested. Additionally, although Zach was literally "detained” by the school officials, none of the school official defendants arrested or seized Zach such that they violated his Fourth Amendment rights. See Wallace v. Batavia Sch. Dist. 101, 68 F.3d 1010, 1013 (7th Cir.1995) ("Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators.”). Furthermore, with regards to Rhys’s arrest, summary judgment was appropriate for all the defendants, except for defendant Stevens, as only Stevens was involved in Rhys’s arrest.
Third, the district court properly granted summary judgment on Rhys’s and Zach's § 1983 Fourteenth Amendment claims against the Probation Department defendants (Hayes, Stevens) and the Cambridge Police Department defendants (LePage, Harbin, City of Cambridge) because they have no authority over suspensions in the Cambridge schools.
Fourth, I concur fully with the majority’s discussion of the state-law claims.

. Hayes was deposed on May 3, 2001. His deposition does not appear in the Joint Appendix, but a copy of the deposition is a part of the official district court record.

. Zach can assert a § 1983 Fourth Amendment claim against both Hayes and Stevens, under theories of direct and supervisory liability, whereas Rhys can pursue his § 1983 Fourth Amendment claim only against Stevens based upon supervisory liability. Hayes arrested Zach and another probation officer, Becky Masters, arrested Rhys; Stevens ordered the arrest of both in her capacity as the supervisor of both probation officers. The supervisor of a violating party may be liable for that party’s violation of a third person’s constitutional rights, if the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it.” Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir.1984). It is not disputed that Stevens "at least implicitly authorized, approved or knowingly acquiesced” in the detention of both students. Id.

. For simplicity's sake, Stevens and Hayes are grouped together in this discussion, because both are liable for Hayes's actions.

. Because I believe that Rhys's and Zach's Fourth Amendment claims should proceed beyond the summary judgment stage, Hayes’s and Stevens's qualified immunity arguments must be taken into account. Public officers who perform discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The applicability of qualified immunity depends on: 1) whether the facts viewed in a light most favorable to the plaintiffs demonstrate that a constitutional violation occurred; 2) whether the violation involved a clearly established right of which a reasonable officer would have known; and 3) whether the plaintiff adduced sufficient facts to prove that the officer's actions were unreasonable in light of the constitutional right. Feathers v. Aey, 319 F.3d 843, 848 (6th Cir.2003). I do not think it can presently be determined whether Hayes and Stevens are entitled to qualified immunity because "[sjummary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights.” Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir.1996); see also Flagner v. Wilkinson, 241 F.3d 475, 481 (6th Cir.2001) ("Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights.”) (quotation omitted).

. Under Ohio state law, a school board may suspend any student up to ten days, but it must give students written notice of the intention to suspend and must provide students with an opportunity to appear at an informal *652 hearing and challenge the reason for the intended suspension. 'See Ohio Rev.Code § 3313.66(A)(l)-(2). The Cambridge Board of Education established its own suspension and removal guidelines under the auspices of § 3313.66(A). Under these procedures, a student may be suspended by the Superintendent or a principal for up to ten days so long as there is notice of and opportunity for a preliminary hearing before the suspension is meted out. During this hearing the student must have a “full opportunity’’ to state why he or she should not be suspended. However, this preliminary hearing is not required if “a clear and present danger exists.” Within one school day after the suspension, the principal must notify the student's parents about the reason for the suspension and notify them of their right to appeal. Then, a student may file a written appeal to the Superintendent within five days. The Superintendent can uphold the suspension, reduce it, or reverse it completely, but if he chooses to maintain the suspension, the student then has the opportunity further to appeal the suspension to the Board of Education within five days.
Additionally, for "emergency removal,” a principal must provide a hearing concerning the removal “[a]s soon as practicable after a removal in excess of twenty-four (24) clock hours but within three (3) school days.” J.A. at 348 (Cambridge Bd. of Educ. Procedures).